UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:11-CV-1188 (TJM/DRH) ) |
| STRATOCOMM CORPORATION, ROGER D. SHEARER, and CRAIG DANZIG, | ) ) ) COMPLAINT ) |
| Defendants. | ) ) ) |

The Securities and Exchange Commission ("Commission") alleges as follows for its complaint against defendants StratoComm Corporation, Roger D. Shearer, and Craig Danzig:

## SUMMARY

1. This action arises out of securities fraud by StratoComm Corporation ("StratoComm"), its chief executive officer Roger D. Shearer ("Shearer"), and its director of investor relations Craig Danzig ("Danzig") in connection with unregistered sales of StratoComm stock. Between November 2007 and May 2009, StratoComm, acting at Shearer's direction and with Danzig's assistance, issued and distributed public statements falsely portraying the company as actively engaged in the manufacture and sale of telecommunications systems for use in underdeveloped countries, primarily in Africa. In reality, the company had no products and no revenue.

2. By April 2010 hundreds of investors had purchased StratoComm stock in unregistered transactions, at a cost of approximately $3 million. Much of the capital obtained from investors was used by Shearer for his personal expenses, including payment of a restitution obligation arising from Shearer's guilty plea in a criminal proceeding.

1

3.  By its false statements and unregistered securities transactions, StratoComm violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

4.  By preparing or arranging for the preparation of StratoComm's false public statements, directing the distribution of those statements, and selling securities in unregistered transactions, Shearer violated Sections 5(a) and 5(c) of the Securities Act and aided and abetted StratoComm's violations of Section 10(b) of the Exchange Act and Rule 10b-5. Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Shearer also is liable as a "controlling person" in connection with StratoComm's violations of Section 10(b) of the Exchange Act and Rule 10b-5.

5.  Danzig likewise violated Sections 5(a), 5(c) and 17(a) of the Securities Act in connection with unregistered sales of securities and aided and abetted StratoComm's violations of Section 10(b) of the Exchange Act and Rule 10b-5. Additionally, Danzig failed to register as a securities broker in violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

6.  In this action the Commission asks the Court to enjoin StratoComm, Shearer, and Danzig (collectively "Defendants") from future violations, require disgorgement of Defendants' ill-gotten gains, require Defendants to pay civil penalties, bar Shearer and Danzig from dealing in penny stocks, and bar Shearer from serving as an officer or director of a public company.

## JURISDICTION AND VENUE

7.  The Court has jurisdiction of this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

8. Venue is proper in the Northern District of New York pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act. StratoComm maintains its principal office in this district and each defendant transacted business in this district. Many of the acts and transactions constituting the violations occurred in this district, including offers and sales of securities. Shearer resides in this district.

9. In connection with the conduct alleged in this Complaint, Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and/or the mails.

## DEFENDANTS

10. **StratoComm** is a Delaware corporation with its principal place of business in Albany, New York. StratoComm was incorporated in 1997 and was formerly known as US/Africa Ventures. StratoComm purports to be in the business of designing, manufacturing, and selling telecommunications equipment. During the period at issue, StratoComm had not registered an offering of securities with the Commission or issued audited financial statements.

11. From 2007 until January 2011, StratoComm's stock was quoted on the electronic quotation system operated by Pink Sheets LLC and its successor Pink OTC Markets, Inc. (hereinafter jointly "Pink Sheets"). Pink Sheets ceased quoting StratoComm's stock in January 2011.

12. **Roger D. Shearer** founded StratoComm in 1997 and was at all relevant times StratoComm's chief executive officer ("CEO"), sole director, and largest beneficial stockholder. Shearer directed and controlled StratoComm's activities, including StratoComm's public statements and stock sales. Shearer resides in Latham, New York.

13. In 2001 the Commission issued an administrative order finding that Shearer violated Sections 5(a) and 5(c) of the Securities Act in connection with unregistered sales of securities issued by two development-stage companies, PriorityAccess, Inc. and Endpoint Technologies, Inc. The Commission ordered Shearer to cease and desist from future violations of Sections 5(a) and 5(c) of the Securities Act.

14. In 2008 Shearer pled guilty to violating New York's Martin Act in connection with a fraudulent real estate scheme.

15. **Craig Danzig** was employed by StratoComm from at least 2007 until November 2010, initially as Director of Investor and Institutional Relations and subsequently as Executive Director of Institutional Relations. Danzig is a resident of Boca Raton, Florida.

16. Prior to joining StratoComm, Danzig was a registered representative associated with several broker-dealers. In 1996 the State of Delaware sanctioned Danzig in connection with unauthorized transactions in a customer account. Also in 1996, Danzig was barred from obtaining a license to sell securities in New Jersey. Danzig's securities license lapsed in 2000.

## DEFENDANTS' VIOLATIONS

### A. StratoComm Had No Products And No Revenue

17. During the period November 2007 through May 2009, StratoComm claimed to be engaged in designing, manufacturing and selling two types of equipment for use in establishing and operating telecommunications systems. According to StratoComm, its Transitional Telecommunications System ("TTS") consisted of an antenna system suspended from a blimp ("aerostat") tethered to the ground. StratoComm claimed that this Transitional Telecommunications System could provide 500,000 subscribers with broadband internet, wireless voice, or broadcast services.

18.     StratoComm also claimed to be developing a Stratospheric Telecommunications System ("STS"), including solar-powered equipment to be stationed in the stratosphere 65,000 feet above ground.  StratoComm claimed that the STS would be able to provide telecommunications services to three million customers in a 1,000 kilometer area.

19.     StratoComm purported to be operating on two parallel tracks: (i) current production and sales of the tethered Transitional Telecommunications System, and (ii) development of the stratospheric system.  However, StratoComm never actually built or tested its Transitional Telecommunications System, much less sold such a system.  StratoComm did not have a prototype of the TTS and had not resolved even basic design issues.

20.     Without products or paying customers, funds from investors were StratoComm's sole source of income.

**B.      StratoComm Lures Investors With False And Misleading Statements**

21.     With the company's existence dependent on raising new funds, StratoComm, acting under Shearer's direction and with substantial assistance from Danzig, represented to the investing public that the company's business was significantly more developed than it actually was.  In press releases and a lengthy marketing document, StratoComm falsely portrayed itself as a company with a functioning product and multi-million dollar sales.  Many of these misleading statements were posted on StratoComm's website ("stratocommcorporation.com," later renamed "stratocomm.net") and distributed via the commercial news service PR Newswire.

22.     **Press Release of November 20, 2007**: On November 20, 2007, StratoComm issued a press release entitled "StratoComm Announces $45 Million System Sale." On the day it was issued, this release was posted on the StratoComm website and distributed via PR Newswire. Shearer drafted this press release and authorized its distribution.  It described

5

StratoComm as a "developer" and "provider" of "telecommunications infrastructure technologies" and touted a "$45 million contract" awarded to StratoComm by an entity in Cameroon for three TTS units and related services. The release quoted Shearer as stating that StratoComm looked forward to "delivery of reliable and cost sensitive telecommunications services to Cameroon" and that the agreement "validates" StratoComm's strategy of obtaining "near term revenue" to support development of its stratospheric system.

23. This press release was materially false and misleading because it portrayed StratoComm as a fully-operational company ready to deliver a complex telecommunications system. StratoComm actually had no Transitional Telecommunications System to provide and no resources to develop such a system. The press release was misleading also because no meaningful contract of sale was in place. The purported sales agreement was contingent on the ability of the purchaser in Cameroon to obtain funding, and there would be no penalty if the purchaser failed to complete the purchase. Although the press release implied that StratoComm would soon be receiving $45 million in revenue, Shearer knew that such revenue would not be forthcoming because (i) the purchaser in Cameroon (a joint venture between StratoComm and a local communications company) lacked the necessary funding and (ii) StratoComm had no TTS units to supply. None of these material facts were disclosed in the press release.

24. Shearer knew when he prepared this press release, and when he authorized its distribution, that it was materially false and misleading.

25. **Press Release of January 29, 2008**: On January 29, 2008, StratoComm issued a press release announcing the "sale" of a Transitional Telecommunications System unit to a joint venture in Madagascar for $15 million. This release, entitled "StratoComm Corporation Signs

"$15 Million System Sale Agreement," was drafted by Shearer.  It was distributed by PR Newswire on the date it was issued and was posted on the StratoComm website on February 26, 2008.  Again StratoComm was described as a "developer" and "provider" of telecommunications infrastructure technologies.  The "sale" to Madagascar was referred to as "StratoComm's most recent system sale."  Shearer was quoted in the release as welcoming the opportunity to "bring enabling telecommunications services to Madagascar."

26.  This press release was materially false and misleading because it described StratoComm as an operating company prepared to deliver TTS units.  Additionally, no real sale had been made to the joint venture in Madagascar because here too the agreement was contingent on the purchaser's ability to obtain funding.  Although the press release implied that StratoComm would soon be receiving millions in revenue, Shearer knew that StratoComm had no TTS units to deliver and the $15 million would not be forthcoming.  None of these material facts were disclosed.

27.  Shearer knew when he prepared this release and authorized its distribution that it was materially false and misleading.

28.  **September 2, 2008 "Executive Overview"**:  In 2008 StratoComm hired a financial marketing firm to assist StratoComm in preparing a document touting StratoComm and its purported products.  The result was a 50-page document dated September 2, 2008, entitled "Executive Informational Overview" ("Executive Overview").  The Executive Overview portrayed StratoComm as an operating company currently producing the Transitional Telecommunications System.  For example, the Executive Overview made the following assertions regarding the dimensions and performance of the TTS:

> The TTS is a tethered aerostat 37 meters in length positioned 1,500 meters above the region for which it provides telecommunications.

7

> Due to its proprietary payload designed in-house by StratoComm's Development Team, the TTS can support broadband Internet, wireless voice, or broadcast services (up to 100 video channels) for roughly 500,000 customers in an 80-kilometer diameter area.

The Executive Overview also stated that StratoComm's New Jersey facility "manufactures the aerostat's proprietary payload," that the TTS was "presently available," and that much of StratoComm's resources were devoted to support of its "installed TTSs." Further, the Executive Overview contained photographs and renderings presented in a manner suggesting that they represented existing StratoComm products, including tethered airships.

29.     The Executive Overview also repeatedly referred to "sales" of Transitional Telecommunications System units. The Executive Overview stated that StratoComm was "presently selling" the TTS, that TTS units "have been sold…for $60 million to date," and that StratoComm's goal was to obtain "up to an additional $75 million in sales" by the end of 2008, which was less than four months after the Executive Overview was issued.

30.     The Executive Overview was false and misleading in depicting StratoComm as actively manufacturing and selling the Transitional Telecommunications System, when in fact StratoComm had no product, no sales, and no basis on which to expect revenue in the foreseeable future.

31.     The Executive Overview was prepared at Shearer's direction. Shearer and Danzig reviewed this document before it was finalized, and Shearer approved the final version. StratoComm's logo appears on each page of the Executive Overview. The final page of the Executive Overview states that it was "prepared by StratoComm Corporation" with the assistance of the marketing firm, Crystal Research Associates, LLC. These disclosures further indicated that the Executive Overview was "based upon information provided by the Company,"

that Crystal Research Associates "has not independently verified such information," and that the compensation paid to Crystal Research included warrants on shares of StratoComm stock.

33.	**Press Release of May 5, 2009**:  On May 5, 2009, StratoComm issued a press release stating that StratoComm was preparing to send engineers to Cameroon "for installation of StratoComm's first commercial wireless telecommunications system."  The press release described testing of the system at the company's facilities in New Jersey and the scheduled departure of the "installation and training team."  The statement emphasized that testing would ensure "efficient installation and reliable operation with system turn on."  This release, entitled "StratoComm Corporation Schedules Initial System Turn On," was distributed via PR Newswire on May 5, 2009.

32.	Shearer knew that the Executive Overview was false and misleading.  Despite this knowledge, the Executive Overview was placed on StratoComm's website on December 3, 2008, for viewing by shareholders, broker-dealers, and potential investors.  The Executive Overview was also posted on the Crystal Research Associates website.

34.	This press release strongly implied that StratoComm was installing its Transitional Telecommunications System in Cameroon.  If StratoComm had reached the stage where it was producing and installing a TTS unit, as the press release suggests, that would have been a major milestone for the company.  In fact, the system to be installed by StratoComm in Cameroon was not the TTS, but a much more rudimentary system involving placement of telecommunications equipment on a radio tower.  Because this key information was omitted, the May 5, 2009, press release was materially misleading.

35.	Shearer drafted this press release and authorized its distribution, knowing that it was materially misleading.

9

C.     **Danzig's Role In The Sale of StratoComm Securities**

36.     Danzig joined StratoComm in mid-2007 as its Director of Investor and Institutional Relations (his title was later changed to Executive Director of Institutional Relations).  In this position, Danzig aggressively marketed StratoComm's stock to existing shareholders and potential new investors throughout the country by telephone, through e-mail, and in face-to-face meetings.

37.     Danzig knew that the Executive Overview falsely described StratoComm as an operating company that was producing and selling TTS units.  In an email on October 30, 2009, more than a year after the Executive Overview was issued, Danzig complained to Shearer that StratoComm had "no money, and no product."  Nevertheless, Danzig used the Executive Overview as a "selling tool" to assist in convincing investors of StratoComm's "legitimacy."  Danzig routinely directed potential investors to the Executive Overview on the Crystal Research website.  He made such referrals by email on the following dates, among others: 12/3/08; 7/9/09; 8/5/09; 8/25/09; 9/29/09; 10/15/09; 10/20/09; and 4/21/10.  Danzig also arranged for a copy of the Executive Overview to be sent to a potential investor (email of 10/19/09), instructed an financial advisor to use the Executive Overview in dealing with a client considering an investment in StratoComm (email of 8/3/09), and directed potential providers of public relations and investment banking services to the Executive Overview (emails of 12/30/08 and 7/12/09).  Danzig also served as the designated contact within StratoComm for investors, relayed the terms of stock sales, handled paperwork relating to stock sales, and facilitated the issuance of shares.

38.     StratoComm paid Danzig a salary plus a "discretionary bonus" based on his performance in raising money by selling the company's securities.  The "discretionary bonus" was in substance a commission based on the amount of money Danzig raised by selling

StratoComm securities to investors. Although Danzig was regularly involved in selling stock and received transaction-based compensation in connection with such sales, he did not register as a broker or become associated with a registered broker.

### D.     **StratoComm's Securities Were Sold In Unregistered Transactions**

39.     StratoComm issued more than 62 million shares to investors between late 2007 and April 2010 but never filed a registration statement with the Commission or provided an offering memorandum to investors.

40.     As StratoComm's CEO and sole director, Shearer authorized StratoComm's stock sales and directed the transfer agent to issue stock certificates. Shearer also communicated with investors, urged them to purchase the company's securities, and negotiated the terms of sales transactions.

41.     StratoComm dissipated much of the funding it received from stock sales and never completed the production or installation of a Transitional Telecommunications System. Between late 2007 and April 2010, Shearer withdrew at least $500,000 from StratoComm for his personal use.

**FIRST CLAIM FOR RELIEF**
**Section 17(a) of the Securities Act**
(StratoComm and Danzig)

42.     Paragraphs 1 through 41 are realleged and incorporated by reference herein.

43.     In the offer or sale of securities using the means or instruments of transportation or communication in interstate commerce or the mails, StratoComm and Danzig: (a) knowingly or recklessly employed a device, scheme, or artifice to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of material fact or an omission of a material fact necessary to make the statement made not misleading; or (c)

knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated as a fraud or deceit on the purchaser.

44. By reason of the foregoing, StratoComm and Danzig have each violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## SECOND CLAIM FOR RELIEF
### Section 10(b) of the Exchange Act and Rule 10b-5
(StratoComm)

45. Paragraphs 1 through 44 are realleged and incorporated by reference herein.

46. In connection with the purchase or sale of securities by use of the means or instrumentalities of interstate commerce or the mails, StratoComm knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated as a fraud or deceit.

47. By reason of the foregoing, StratoComm has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Section 20(a) of the Exchange Act
(Shearer)

48. Paragraphs 1 through 47 are realleged and incorporated by reference herein.

49. Through the conduct described above, StratoComm violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

50. When StratoComm violated Section 10(b) of the Exchange Act and Rule 10b-5, Shearer had the power to control, and did control, the conduct of StratoComm. Shearer was a

"controlling person" within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] with regard to StratoComm.

51. Because Shearer was a controlling person with regard to StratoComm and induced the acts constituting StratoComm's violations, but did not act in good faith, he is jointly and severally liable with and to the same extent as StratoComm for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 and, unless enjoined, will continue to act as a "controlling person" in connection with such violations.

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of
Section 10(b) of the Exchange Act and Rule 10b-5**
(Shearer and Danzig)

52. Paragraphs 1 through 51 are realleged and incorporated by reference herein.

53. Through the conduct described above, StratoComm violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

54. Shearer and Danzig knowingly provided substantial assistance to StratoComm in StratoComm's violations of Section 10(b) of the Exchange Act and Rule 10b-5.

55. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] Shearer and Danzig are deemed to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as StratoComm and, unless enjoined, will continue to aid and abet violations of those provisions.

### FIFTH CLAIM FOR RELIEF
**Sections 5(a) and 5(c) of the Securities Act**
(StratoComm, Shearer, and Danzig)

56. Paragraphs 1 through 55 are realleged and incorporated by reference herein.

57. StratoComm, Shearer, and Danzig made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to sell securities when

13

no registration statement was in effect as to such securities and no exemption from registration was available.

58. StratoComm, Shearer, and Danzig made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell securities when no registration statement had been filed as to such securities and no exemption from registration was available.

59. By reason of the foregoing, StratoComm, Shearer and Danzig have each violated, and unless enjoined will again violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SIXTH CLAIM FOR RELIEF
### Section 15(a) of the Exchange Act
(Danzig)

60. Paragraphs 1 through 59 are realleged and incorporated by reference herein.

61. Danzig made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, securities issued by StratoComm. Danzig was engaged in the business of effecting transactions in the securities of StratoComm for the account of others.

62. Danzig was not registered as a broker and was not associated with a registered broker.

63. By reason of the foregoing, Danzig has violated, and unless enjoined will again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court:

A.      Permanently enjoin StratoComm from violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

B.      Permanently enjoin Shearer from (i) violating Sections 5(a) and 5(c) of the Securities Act, (ii) aiding and abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and (iii) violating Section 10(b) of the Exchange Act and Rule 10b-5 as a "controlling person" within the meaning of Section 20(a) of the Exchange Act;

C.      Permanently enjoin Danzig from (i) violating Sections 5(a), 5(c) and 17(a) of the Securities Act, (ii) aiding and abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5, and (iii) violating Section 15(a) of the Exchange Act;

D.      Order Defendants to disgorge all their ill-gotten gains obtained as a result of the violations alleged in this Complaint, with prejudgment interest;

E.      Order Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

F.      Bar Shearer and Danzig pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)] from participating in any offering of penny stock;

G.      Bar Shearer from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

H.      Grant such further relief as the Court may deem just and appropriate.

Dated: October 4, 2011

          s/ H. Michael Semler
          H. Michael Semler
          NDNY Bar No. 517133
          District of Columbia Bar No. 477398
          Division of Enforcement
          Securities and Exchange Commission
          100 F Street, N.E.
          Washington, D.C. 20549
          Tel:  (202) 551-4429
          Fax: (202) 772-9292
          Email: semlerm@sec.gov

Of Counsel:
Jennifer Leete
(Not Admitted in NDNY)
District of Columbia Bar No. 446067
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Tel:  (202) 551-4971
Email: leetej@sec.gov

Sarah L. Allgeier
(Not Admitted In NDNY)
District of Columbia Bar No. 990308
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Tel:  (202) 551-4757
Email: allgeiers@sec.gov

          Attorneys for Securities and Exchange
            Commission