**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SECURITIES AND EXCHANGE**
**COMMISSION,**

        **Plaintiff,**

     **v.**                                      **1:11-CV-1188**

**STRATOCOMM CORPORATION,**
**ROGER D. SHEARER, and**
**CRAIG DANZIG,**

        **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION & ORDER**

## I.    INTRODUCTION

This is a civil enforcement action brought by the Securities and Exchange Commission ("the SEC" or "the Commission") against StratoComm Corporation ("StratoComm"), Roger D. Shearer ("Shearer") and Craig Danzig ("Danzig"). The Commission asserts that the defendants committed securities fraud and registration violations in the offer and sale of StratoComm penny stock. In this regard, the Commission contends that StratoComm, under the control of Shearer and with the assistance of Danzig, disseminated fraudulent public statements designed to portray StratoComm as a successful company that had developed, manufactured and sold sophisticated telecommunications equipment for tens of millions of dollars. However,

1

the Commission asserts that the undisputed facts reveal that StratoComm had no products, no paying customers, and no revenues; and that its very existence depended on its ability to sell its securities to investors. The Commissioner further asserts that StratoComm disseminated fraudulent statements to the public in three press releases and a marketing document posted on the internet and distributed to potential investors. During this same time period, the defendants sold millions of shares of StratoComm's stock to over 100 investors. Yet, StratoComm's stock offering was not registered as required by law. In addition, Danzig, who was in the forefront of selling StratoComm's stock, was not registered as a broker.

The Commission moves for partial summary judgment on the issue of liability for each of its claims. StratoComm and Shearer have opposed the motion, but Danzig, who is proceeding *pro se*, has failed to submit any opposition. The Commission has also submitted reply papers. The Court has considered all of the submitted papers in reaching its decision on the pending motion.

## II.   BACKGROUND[1]

### a.  StratoComm Corporation

StratoComm Corporation ("StratoComm") is a Delaware corporation that was incorporated in 1997. It describes itself as being in the business of designing, manufacturing, and selling telecommunications equipment. StratoComm's stock is a penny stock that is publicly traded and quoted on the electronic quotation system formerly

---

[1]Unless indicated otherwise, the facts set forth above are admitted by the opposing party, properly supported by the record, or deemed admitted (Danzig, who is proceeding *pro se*, failed to respond to the motion so the properly support facts pertinent to him are deemed admitted, see Local Rule 7.1(a)(3)).

known as the Pink Sheets.  From late 2007 until April 2010, StratoComm received approximately $4 million from selling its stock to more than 100 investors. StratoComm has never filed a registration statement with the U.S. Securities and Exchange Commission, ("Commission"), never prepared audited financial statements or provided an offering memorandum to investors.

### b.  Roger D. Shearer

Roger D. Shearer, who founded StratoComm in 1997, is the sole Officer and Director of StratoComm and has held those positions since the inception of the company. Shearer is also the Chief Executive Officer ("CEO") of StratoComm and has held that position since the inception of the company except for a one-month period in the fall of 2010.  As CEO, Shearer controlled the conduct of StratoComm during all periods in which he was CEO.  As sole Director of StratoComm, Shearer authorized himself, as CEO of StratoComm, to issue StratoComm stock between January 2007 and January 2011.  From November 2007 until April 2010, Shearer was StratoComm's largest beneficial stockholder.

### c.  Craig Danzig

Craig Danzig was employed by StratoComm from at least 2007 until November 2010, initially as Director of Investor and Institutional Relations and subsequently as Executive Director of Institutional Relations.  Prior to joining StratoComm, Danzig was a registered representative (commonly known as a "stockbroker") associated with several broker-dealers.  Danzig held a license to sell securities from 1991 until 2000, when it lapsed. From November 2007 through April 2010, Danzig was not licensed to sell

securities.

### d. StratoComm Portrayal as a Successful Telecommunications Company

The SEC asserts that during the period November 2007 through April 2010, StratoComm stated that it was designing, manufacturing and selling telecommunications equipment called the Transitional Telecommunications System ("TTS") to countries in the developing world. Plt. Statement of Facts ("PSOF") ¶ 19. Defendants StratoComm and Shearer asserts that StratoComm did not state that it manufactured anything "other than its proprietary payload" and that, to the extent their Answer can be read as admitting that it manufactured telecommunications systems generally, it "was an unintentional oversight." Shearer SOF ¶ 19; see also StratoComm SOF ¶ 19.

According to the SEC, StratoComm described its TTS as consisting primarily of an antenna system suspended from a blimp ("aerostat") tethered to the ground. PSOF ¶ 20. Defendants StratoComm and Shearer deny this statement and contend that "the transitional telecommunications system consists primarily of three components, including the users segment, the flight segment and the ground segment, each of which are composed of separate and distinct components. . . . The flight segment consists of the aerostat, tether, and mooring system." Shearer SOF ¶ 20.

It is undisputed that StratoComm stated that its TTS could provide 500,000 subscribers with broadband internet, wireless voice, or broadcast services. StratoComm also stated that it was developing a Stratospheric Telecommunications System ("STS"), including solar-powered equipment to be stationed in the stratosphere 65,000 feet above ground. StratoComm explained that the STS would be able to provide telecommunications services to three million customers in a 1,000 kilometer area, and that it was operating on

two parallel tracks: (i) current production and sales of the TTS, and (ii) development of the stratospheric system. It is also undisputed, however, that StratoComm has never actually built a TTS; has never tested an operational prototype of a TTS; has never had all of the parts to construct a TTS; has never possessed an aerostat; has never had the funds to acquire an aerostat; has never exchanged a TTS for money; and has never received a deposit on a TTS.

The Commission further maintains that as of late 2007, StratoComm had not yet resolved basic design issues relating to the TTS and had only estimated the cost of the system at a rough level. PSOF ¶ 33. Defendants contend that at the referenced time, "the design was complete and the TTS was marketable for sale and deliverable, but for the finding of a moneyed purchaser." Shearer SOF ¶ 33; see also StratoComm SOF ¶ 33. It is undisputed, however, that StratoComm has never acquired any customers who transmitted payment to StratoComm for products or services; has never had any revenue; and its sole source of support, aside from loans from friends and family, has been the money that it received from selling its securities to investors.

### e. StratoComm's Alleged False And Misleading Statements

#### 1. November 20, 2007 Press Release

During the November 2007 through May 2009 time period, Shearer, acting within the scope of his authority and in his capacity as CEO of StratoComm, was authorized to write, publish and distribute press releases on behalf of StratoComm. On November 20, 2007, StratoComm issued a press release entitled "StratoComm Announces $45 Million System Sale." The press release identifies StratoComm as its source. Shearer, acting

within the scope of his authority, and in his capacity as CEO of StratoComm, wrote the November 20, 2007 press release and authorized its release and publication. The press release was posted on StratoComm's website and was distributed to the public via PR Newswire on November 20, 2007.  This press release states that Evergreen ISP Platform, PLC "has contracted with StratoComm for the purchase of $45,000,000 of StratoComm Transitional System telecommunications equipment and services."  The press release described StratoComm as a "provider" of "telecommunications infrastructure technologies" and stated that a "$45 million contract" was "awarded" to StratoComm by an entity in Cameroon for three TTS units and related services.  However, as of November 20, 2007, StratoComm had never built or tested an operational TTS and StratoComm did not have the money to do so.

The SEC asserts that "on November 20, 2007, Shearer knew that StratoComm did not have an operational TTS prototype and had no TTS units to supply." PSOF ¶ 47. Defendants "object[] to the characterization that StartoComm 'had no TTS units to supply'" because "[i]t was a logistical impracticality and financial impossibility to maintain a TTS unit 'in stock' before a purchaser was acquired and paid a significant downpayment. Moreover, StratoComm was able to supply a TTS at any time, given its possession of the proprietary payload and the ready availability of the additional required off-the-shelf components to be supplied through third-party vendors." Shearer SOF ¶ 47; StratoComm SOF ¶ 47.

However, it is undisputed that on November, 20, 2007, StratoComm had not provided telecommunications infrastructure technologies to any person or entity, and Shearer knew StratoComm did not have the funding in place to build a TTS.  Thus,

6

defendants concede that when Shearer drafted the November 20, 2007 press release, he knew that StratoComm had not provided telecommunications infrastructure technologies to any person or entity. Moreover, StratoComm never received a monetary deposit or payment from Evergreen ISP Platform based upon the sale announced in the November 20, 2007 press release and StratoComm never received any revenue based upon the sale referenced in the November 20, 2007 press release.

## 2. January 29, 2008 Press Release

On January 29, 2008, StratoComm issued a press release announcing the sale, valued at $15 million, of a TTS and related services to StratoComm's joint venture partner in Madagascar. The press release identifies StratoComm as its source. Shearer, acting within the scope of his authority and in his capacity as CEO of StratoComm, wrote the January 29, 2008 press release, and acting within the scope of his authority and in his capacity as CEO of StratoComm, authorized the release and publication of the January 29, 2008 press release. StratoComm's January 29, 2008 press release was distributed to the public via PR Newswire on the same date, and posted on StratoComm's website on February 26, 2008. The January 29, 2008 press release referred to the Madagascar transaction as "StratoComm's most recent system sale," and described StratoComm as a "provider" of telecommunications infrastructure technologies. However, as of January 29, 2008, StratoComm had never built or tested an operational TTS and StratoComm did not have the money to do so. The Commission contends that, as of January 29, 2008, Shearer knew that StratoComm did not have an operational TTS prototype or TTS unit to supply to Madagascar. PSOF ¶ 61. Shearer "objects" to this assertion, contending again that "[i]t was a logistical impracticality and financial impossibility to maintain a TTS unit 'in

stock' before a purchaser was acquired and paid a significant downpayment," and that "StratoComm was able to supply a TTS at any time, given its possession of the proprietary payload and the ready availability of the additional required off-the-shelf components to be supplied through third-party vendors."  Shearer SOF § 61; <u>see also</u> StratoComm SOF § 61 (same).

However, there is no dispute that as of January 29, 2008, StratoComm had not provided telecommunications infrastructure technologies to any person or entity, and Shearer knew that StratoComm did not have the funding in place to build a TTS. It is also undisputed that StratoComm never received a monetary deposit or payment from StratoComm Madagascar SA based upon the sale announced in the January 29, 2008 press release, and StratoComm never received any revenue based upon the agreement referenced in the January 29, 2008 press release.

### 3. September 2, 2008 "Executive Informational Overview"

On September 2, 2008, StratoComm published its Executive Informational Overview.  It was prepared at the direction of Shearer acting within the scope of his authority and in his capacity as CEO of StratoComm. The Executive Informational Overview was prepared by StratoComm with the assistance of Crystal Research Associates, LLC.  StratoComm paid Crystal Research Associates $40,000 and provided 300,000 StratoComm stock warrants to assist in the preparation of the Executive Informational Overview.  The Executive Informational Overview was based upon information provided by StratoComm.  Shearer reviewed, approved and authorized the release of the Executive Informational Overview.  StratoComm's logo and contact information appeared at the top of the first page of the Executive Informational Overview

8

and StratoComm's logo appears on every page of the document.

StratoComm's Executive Informational Overview stated that "StratoComm's aerostat is nearly 37 meters in length and 12 meters at its widest portion. It meets all U.S. Federal Aviation Administration (FAA) requirements, including the presence of an emergency flight termination system and proper lighting, and can carry a payload of up to 225 kilograms." The Executive Informational Overview made the following assertions regarding the dimensions and performance of the TTS:

> The TTS is a tethered aerostat 37 meters in length positioned 1,500 meters above the region for which it provides telecommunications. Due to its proprietary payload designed in-house by StratoComm's Development Team, the TTS can support broadband Internet, wireless voice, or broadcast services (up to 100 video channels) for roughly 500,000 customers in an 80-kilometer diameter area.

StratoComm's Executive Informational Overview at 37.

StratoComm's Executive Informational Overview described the TTS as "presently available," and stated that much of the company's resources were devoted to support of its "installed TTSs." StratoComm's Executive Informational Overview at 6. StratoComm's Executive Informational Overview also stated that, "[a]t present, the Company has sold three TTS aerostats to Cameroon [and] one to Madagascar…" The Executive Informational Overview contained pictures and artist's renderings that, the SEC contends, were "presented in a manner suggesting that they represented existing StratoComm systems, such as tethered airships." PSOF ¶ 78; but see Shearer SOF § 78;[2]

_____

[2]("Defendant Shearer denies the assertions contained in [PSOF] paragraph 78. The assertion that the pictures and artist's renderings in the Executive Informational Overview were presented in a manner suggesting they represented existing systems is an opinion of the author of the assertion in paragraph 78 and cannot be said to be a fact. What is a fact is that the Executive Informational Overview refers to pictures and drawings produced in the Overview as depicted renderings, not actual photographs of existing items.")

StratoComm SOF ¶ 78.[3]

The Executive Informational Overview also stated that StratoComm was "presently selling" the TTS, that TTS units "have been sold…for $60 million to date," and that its goal was to obtain "up to an additional $75 million in sales" by the end of 2008, which was less than four months after the Executive Informational Overview was issued. Executive Informational Overview at 13, 36. StratoComm admits this statement, but adds that "the Overview goes on to state that 'the Company expects to begin receiving funds under these sales contracts during the fourth quarter 2008.'" StratoComm SOF ¶ 80. Shearer "admits in part" the SEC's statement, but "notes that while the Overview states that TTS units have been sold for $60 million, it also clearly states in the same sentence that 'the Company expects to begin receiving funds under these sales contracts during the fourth quarter 2008,' which clearly by implication means that the company had received no funds under the sales contracts." Shearer SOF ¶ 80. Nevertheless, defendants concede that StratoComm's Executive Informational Overview stated that "the TTS now supports wireless telephony," and that, "StratoComm anticipates that the first TTS unit will likely be in service by the first quarter 2009."

The Commission asserts that the "Executive Informational Overview described a product that does not exist and sales that never occurred." PSOF ¶ 83. Shearer contends that: (1) "the Overview describes more than one product; namely, that TTS and the STS, a transitional telecommunications system and a stratospheric telecommunications system,

---

[3]("Denies the assertions in [PSOF] Paragraph 78 as the self-serving characterizations of a party, and affirmatively states that the pictures and drawings in the Overview are referred to as depicted renderings and not actual photographs of existing items.")

respectively;" (2) "the reality is that all of the components of the described products existed, but not as a single unit. . . .  Instead, the Overview claimed only that the company manufactured – and hence maintained physically – the proprietary payload;" (3) "the Overview made clear that a 'turnkey aerostat' would be shipped to a buyer only when it had been developed;" (4) "it is undisputed that StratoComm entered into several contracts for sale. In fact, the Overview reflects that "StratoComm has entered into contracts that are <u>expected</u> to result in TTS sales of $60 million dollars." (emphasis in SOF); and (5) "[c]ontracts for sale were executed between StratoComm and system purchasers on two occasions." Shearer SOF ¶ 83. StratoComm asserts that

> each of the components of the described products existed, but not as a single unit. . . .  The Overview claimed only that the company manufactured – and hence maintained physically – the proprietary payload. . . . It is undisputed that StratoComm entered into contracts for the sale of the TTS. StratoComm did not represent that it had already been paid on such contracts. The Overview reflects that "StratoComm has entered into contracts that are expected to result in TTS sales of $60 million dollars." The Overview also detailed extensive risks with respect to potential barriers to the fruition of the contracts.

StratoComm SOF ¶ 83 (citations omitted).

However, is undisputed that when Shearer approved the Executive Informational Overview for public distribution, he knew that (1) StratoComm had never owned an aerostat; (2) StratoComm never had the funding to purchase an aerostat or build an operational TTS; (3) StratoComm has never delivered an operational TTS to any entity; (4) StratoComm had not installed a TTS; and (5) StratoComm had not received payment in connection with the sales agreements referenced in the November 20, 2007 and January 29, 2008 press releases.  Danzig reviewed the Executive Informational Overview before it was finalized, and it was placed on StratoComm's website on December 3, 2008 and

11

posted on Crystal Research Associates' website on September 2, 2008.

### 4. May 5, 2009 Press Release

On May 5, 2009, StratoComm issued a press release entitled, "StratoComm Corporation Schedules Initial System Turn On."  Shearer, acting within the scope of his authority and in his capacity as CEO of StratoComm, wrote the May 5, 2009 press release and, acting within the scope of his authority and in his capacity as CEO of StratoComm, authorized the release and publication of the May 5, 2009 press release.  StratoComm's May 5, 2009 press release was distributed via PR Newswire on May 5, 2009. This  press release identifies "StratoComm Corporation" as its "source" and noted that "a team of engineers" was departing for Cameroon, "the location for installation of StratoComm's first commercial wireless telecommunications system."  The May 5, 2009 press release described testing of the system at the company's facilities in New Jersey and the scheduled departure of the "installation and training team."  It also emphasized that testing would ensure "efficient installation and reliable operation with system turn on."

It is conceded that the reference in the May 5, 2009 press release to "StratoComm's first commercial wireless telecommunications system" was not to a TTS. Rather, the system to be installed in Cameroon involved placement of telecommunications equipment on a radio tower. The press release did not disclose that the system installed in Cameroon was not a TTS.  Further, the press release did not disclose that the system installed in Cameroon was anchored to a tower.  It is conceded that if StratoComm had progressed to a stage where it had constructed and installed a TTS, that would have been a very significant event for the company.

12

**f.  Danzig's Marketing and Sales of StratoComm Stock**

In his role as Director of Investor and Institutional Relations and subsequently as Executive Director of Institutional Relations, Danzig's primary responsibility was to market StratoComm's stock to investors.  Danzig served as the designated contact within StratoComm for investors, relayed the terms of stock sales, handled paperwork relating to stock sales, and facilitated the issuance of shares.  He marketed StratoComm's stock throughout the country by telephone, through e-mail and in face-to-face meetings.  Danzig used the Executive Informational Overview as a "selling tool" to market StratoComm's stock and to convince investors of StratoComm's "legitimacy;" routinely directed potential investors to the Executive Informational Overview on the Crystal Research website; arranged for a copy of the Executive Informational Overview to be sent to potential investors; instructed a stock broker to use the Executive Informational Overview in dealing with a client considering an investment in StratoComm; directed potential providers of public relations services to the Executive Informational Overview; and directed potential providers of investment banking services to the Executive Informational Overview.

It is undisputed that when Danzig distributed the Executive Informational Overview to potential investors, Danzig knew that StratoComm did not have a TTS. In an email on October 30, 2009, more than a year after the Executive Informational Overview was issued, Danzig complained to Shearer that StratoComm had "no money, and no product." StratoComm paid Danzig a salary plus a "discretionary bonus" that was based on his performance in raising money by selling the company's securities. While marketing and selling StratoComm stock to investors, Danzig was not registered as a broker and was not associated with a registered broker.

13

## III. DISCUSSION

### a. Antifraud Provisions of the Federal Securities Laws

The antifraud provisions of the federal securities laws include Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, and Section 17(a) of the Securities Act of 1933 (the "Securities Act"). 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5 and 15 U.S.C. § 77q(a). To establish a violation of Section 17(a)(1) of the Securities Act or Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the Commission must demonstrate: (1) a misrepresentation or omission, (2) that was material, (3) that was made in the offer and sale of a security (Section 17(a)(1)) or in connection with the purchase or sale of securities (Section 10(b) and Rule 10b-5), (4) scienter, and (5) the involvement of interstate commerce, the mails, or a national securities exchange. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *see* 15 U.S.C. § 78j(b).[4] Scienter is not an element of a violation of Section 17(a)(2) or (3). *First Jersey Sec.,* 101 F.3d at 1467.

### 1. Misrepresentation or Omission

Statements that create a false impression that a company has a developed, tested and presently available product when, in fact, it has not, are false, misleading, and

---

[4]In pertinent part, Section 10(b) declares it unlawful for any person, directly or indirectly, by the use of any means of interstate commerce, the mails, or a national securities exchange,

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

constitute misrepresentations under the antifraud provisions of the federal securities laws. *SEC v. Platforms Wireless Int'l., Corp.,* 617 F.3d 1072 (9th Cir. 2010);[5] *see also SEC v. North American Research & Dev. Corp.*, 424 F.2d 63, 77 (2d Cir. 1970)("the deliberate use of ambiguities and half-truths" rendered statements "materially false and misleading"); *SEC v. Schiffer*, No 91 Civ. 5835, 1998 WL 307375 at *2 (S.D.N.Y June 11, 1998) ("half-truths are as violative of [sic] as outright falsehoods").

## A.  November 2007 and January 2008 Press Releases

The November 20, 2007 press release described StratoComm as a "provider" of "telecommunications infrastructure technologies" and announced that StratoComm was "awarded" a "$45 Million contract for the sale" of three TTS units in Cameroon. The press release represented that StratoComm's Cameroonian joint venture had contracted with StratoComm for the purchase of $45 million worth of "StratoComm Transitional System telecommunications equipment and services."  Although defendants assert that "the design was complete and the TTS was marketable for sale and deliverable, but for the finding of a moneyed purchaser," that qualification does change the fact that the November 20, 2007 press release represented that StratoComm had contracted for the sale of the TTS technology.  Moreover, it is undisputed that on

---

[5]In *Platforms Wireless*, the company issued a press release describing a telecommunications system remarkably similar to StratoComm's purported systems. Platforms' "ARC" telecommunications system consisted of a portable antenna payload and either airplanes or aerostats to carry the antenna aloft. *Platforms Wireless*, 617 F.3d at 1981. The press release described technical details and performance characteristics of the various components of the ARC system and spoke in the present tense when describing the components (*i.e.*, "the Zero-Gravity Aerostructure is a large, manned, helium-filled aerodynamically-shaped airship structure.") *Id.* at 1082. In contrast to the press release, Platforms Wireless did not have an operational prototype of the ARC system or the money to build a prototype. The court concluded that the press release was materially misleading because "[c]onsidered as a whole, it leaves the unmistakable impression that the ARC system exists." *Id.* at 1095.

15

November, 20, 2007, StratoComm had not provided telecommunications infrastructure technologies to any person or entity, and Shearer knew StratoComm did not have the funding in place to build a TTS. Still further, it is undisputed that StratoComm never received a monetary deposit or payment based upon the sale announced in the November 20, 2007 press release, and StratoComm never received any revenue based upon the sale referenced in the November 20, 2007 press release.

On January 29, 2008, StratoComm issued another press release announcing the "sale" of a TTS unit in Madagascar for $15 million. This release, entitled "StratoComm Corporation Signs $15 Million System Sale Agreement," again described StratoComm as a "provider" of "telecommunications infrastructure technologies." The press release referred to the Madagascar "sale" as "StratoComm's most recent system sale." While Shearer contends that it was a logistical impracticality and financial impossibility to maintain a TTS unit "in stock" before a purchaser was acquired and paid a significant down payment for it, that does not change the misleading nature of the January 29, 2008 press release that indicated that a $15 million sale had occurred in Madagascar. Further, his current assertion that StratoComm "at all times possessed its proprietary telecommunications payload" or "it manufactured the proprietary telecommunications payload" is contradicted by his own prior sworn testimony to the SEC in May 2008. In this regard, Shearer testified that "[t]he payload is completely designed, yeah. We have not manufactured the first one yet." 5/22/2008 Shearer Investigative Test. at 90:5-6 (emphasis added). It is well settled that a party may not create a question of fact sufficient to defeat summary judgment by submitting an affidavit that contradicts prior sworn testimony. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997).

16

Defendants' contention that the press releases are not false and misleading because they contained Shearer's contact information for potential investors to obtain any additional information is insufficient speculation upon which to defeat summary judgment. Further, "investors are not generally required to look beyond a given document to discover what is true and what is not." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008) (citing *Dale v. Rosenfeld*, 229 F.2d 855, 858 (2d Cir. 1956) ("Availability elsewhere of truthful information cannot excuse untruths or misleading omissions in the prospectus. Readiness and willingness to disclose are not equivalent to disclosure.")).

There can be no legitimate dispute that these press releases are false and misleading because they give the impression that the TTS actually existed in operational, readily deployable form, when the TTS did not even exist. It is undisputed at the time that StratoComm issued these press releases, StratoComm had not built or tested an operational prototype of the TTS and did not have the money to do so. Indeed, around the time that StratoComm disseminated these press releases, it had not resolved even basic design issues related to the TTS.

By announcing two "sales" of StratoComm "Transitional System telecommunications equipment" and services worth a total of $60 million, StratoComm's press releases leave the unmistakable—and false—impression that the TTS exists when it did not. In light of these purported sales announced by these press releases, it was "highly unreasonable" for StratoComm not to disclose that the TTS did not actually exist and that StratoComm had never actually built or tested such a system. *See Platforms Wireless*, 617 F.3d at 1095.

The press releases are also false and misleading because they refer to

17

StratoComm as a "provider" of "telecommunications infrastructure technologies." There is no dispute that as of November 2007 and January 2008, StratoComm had not "provided" telecommunications infrastructure technologies to any person or entity.

## B. September 2, 2008 "Executive Informational Overview"

StratoComm made additional false and materially misleading statements regarding the existence of the TTS through the preparation and dissemination of the Executive Overview, which included present-tense descriptions of the physical traits, dimensions, performance and service capabilities of the TTS.[6] These present-tense statements are false and misleading because they leave "the unmistakable impression that [StratoComm possessed an operational aerostat and the TTS] system exists." *Platforms Wireless*, 617 F.3d at 1095. It is undisputed that StratoComm did not possess an aerostat and never had the funding to purchase one. Yet, the Executive Overview represented the TTS as "presently available" and stated that much of the company's resources were devoted to supporting its "installed TTSs." This was false and misleading because there were no "installed TTSs" at the time the Executive Overview was written and disseminated.

---

[6]For example, the Executive Overview stated:

StratoComm's aerostat is nearly 37 meters in length and 12 meters at its widest portion. It meets all U.S. Federal Aviation Administration (FAA) requirements, including the presence of an emergency flight termination system and proper lighting, and can carry a payload of up to 225 kilograms.

The Executive Overview also made the following assertions regarding the dimensions and performance of the TTS:

The TTS is a tethered aerostat 37 meters in length positioned 1,500 meters above the region for which it provides telecommunications. Due to its proprietary payload designed in-house by StratoComm's Development Team, the TTS can support broadband Internet, wireless voice, or broadcast services (up to 100 video channels) for roughly 500,000 customers in an 80-kilometer diameter area.

The Executive Overview also included visual images suggesting that StratoComm products, including tethered airships, actually existed. These statements and impressions, however, are false and misleading because StratoComm had never possessed an aerostat or built an operational TTS.

The Executive Overview also repeatedly referred to "sales" of TTS units and stated that TTS units "have been sold…for $60 million to date." Further, the Executive Overview stated that StratoComm's goal was to obtain "up to an additional $75 million in sales" by the end of 2008, which was less than four months after the Executive Overview was issued. Yet, when the Executive Overview was issued, StratoComm had no TTSs to sell and no resources to build one. No reasonable fact finder could conclude that, as Shearer contends, the Overview describes TTS and STS systems; "the Overview claimed only that the company manufactured – and hence maintained physically – the proprietary payload;" the Overview merely indicated that "a 'turnkey aerostat' would be shipped to a buyer only when it had been developed;" the Overview reflects that "StratoComm has entered into contracts that are expected to result in TTS sales of $60 million dollars;" and, the Overview divulged that "[c]ontracts for sale were executed between StratoComm and system purchasers on two occasions."

Taken together, the representations made in StratoComm's Executive Overview paint a clear picture that the TTS existed and multiple units had been sold for millions. This was not true. The use of cautionary language in the Overview does not shield defendants from liability. *See SEC v. Meltzer*, 440 F. Supp. 2d 179, 191 (E.D.N.Y. 2006)(generalized disclosures of amorphous risks do not shield defendants' from liability). Moreover, any insulation from liability through the use of cautionary language does not

apply to "historical or present fact-knowledge" -- statements that a defendant knew was false when made, as was the case here. *Id.* at 191-92. In addition, a showing of investor reliance is not required to establish fraud. *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490-91 (S.D.N.Y. 2002). Thus, the fact that a select few investors have attested that they were not mislead by the Overview is of no moment. *See United States v. Elliot*, 62 F.3d 1304, 1308 (11th Cir. 1995). Accordingly, were the case to proceed to trial, there could be no conclusions other than that StratoComm's Executive Overview, like the press release in Platforms Wireless, is "deceptive, an absolute and unequivocal falsehood." *Platforms Wireless*, 617 F.3d at 1095.

### C. May 5, 2009 Press Release

On May 5, 2009, StratoComm issued a press release announcing that it would "turn on" of its first system. In the months leading up to this press release, StratoComm had stated publicly that it anticipated that "the first TTS unit will likely be in service by the first quarter 2009." The May 5, 2009 press release stated that StratoComm was preparing to send engineers to Cameroon "for installation of StratoComm's first commercial wireless telecommunications system." The press release described testing of the system at the company's facilities in New Jersey and the scheduled departure of the "installation and training team." It emphasized that testing would ensure "efficient installation and reliable operation with system turn on."

In light of the surrounding circumstances, and in particular, StratoComm's public statement that it anticipated that the first TTS would be in service at the beginning of 2009, this press release implied that StratoComm was installing its TTS in Cameroon. It was not.

The system to be installed in Cameroon was not the TTS, but a much more rudimentary system involving the placement of an antenna on a radio tower.  There is no merit to defendants' contention with respect to the May 5, 2009 press release that a "reasonable investor familiar with StratoComm's prior disclosures would read" it in a certain way and would figure out the truth.  StratoComm Memo at 10.  As indicated above, investors are not generally required to look beyond a given document to discover what is true and what is not.

Based on the undisputed evidence,  a reasonable fact finder could only conclude that  StratoComm's failure to disclose the material facts regarding the nature of the system installed in Cameroon was misleading.

### 2.  Materiality

Information is material if there is a "substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994); *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 423 (S.D.N.Y 2007).  An omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132 (1976).  Statements related to whether a company has a product to sell are material as a matter of law. *SEC v. Enter. Solutions, Inc.*, 142 F. Supp. 2d 561, 577 (S.D.N.Y. 2001) ("[w]hether the company actually had products to sell is clearly relevant information to a potential investor.").  This is particularly true for development-stage companies. "A

finished, tested product is almost certainly the single most important piece of information for an investor deciding whether to invest in a start-up company." *Platforms Wireless*, 617 F.3d at 1095.

The false and misleading statements in StratoComm's press releases and the Executive Overview were material. StratoComm's statements falsely portrayed it as a development-stage company that had progressed to the operational stage with a finished product and sales, when it had not. These misstatements are material bause they relate to whether the company has a product to sell and a viable business model. *See Enter. Solutions*, 142 F. Supp. 2d at 577.

### A. Maker of the Statement

StratoComm made the false and misleading statements in the press releases and the Executive Overview. *See Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011)(with respect to material misstatements under Exchange Act Rule 10b-5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."); *SEC v. Stoker*, 865 F. Supp. 2d 457, 463  (S.D.N.Y. 2012).[7]  Each of the press releases identify StratoComm as its "source."   Acting within the scope of his authority as StratoComm's

---

[7]("To begin with, [Section 17(a)], on its face, does not state that a defendant must obtain the funds personally or directly. On the contrary, all three prongs of liability under Section 17(a) are preceded by the common modifier "directly or indirectly." It would be contrary to this language, and to the very purpose of Section 17(a), to allow a corporate employee who facilitated a fraud that netted his company millions of dollars to escape liability for the fraud by reading into the statute a narrowing requirement not found in the statutory language itself. As the Supreme Court has repeatedly stated, "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purpose.' " *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S. Ct. 1456, 31 L.Ed.2d 741 (1972) (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L. Ed.2d 237 (1963)).")

CEO, Shearer drafted, authorized and disseminated each release. Thus, StratoComm is the entity with ultimate control over the statements in the press releases, including their "content and whether and how to communicate it." *Janus Capital Group*, 131 S. Ct. at 2302.

StratoComm also made the false and misleading statements in the Executive Overview. The Executive Overview itself states that StratoComm prepared it with the assistance of Crystal Research Associates. StratoComm's logo appears on every page and the company's contact information appears at the top of the first page. StratoComm had ultimate control over the Executive Overview's content and whether and how to communicate it. StratoComm paid for the Executive Overview, and Shearer, as StratoComm's CEO, approved the final version. Thus, StratoComm made the false and misleading statements in the press releases and the Executive Overview.

### 3. Statements Made in Connection with the Offer, Purchase or Sale of Securities

Courts construe broadly the "in connection with" element of Section 10(b), Rule 10b-5, and Section 17(a). *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 491 (S.D.N.Y. 2002); *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y.1992). To establish that fraudulent conduct satisfies the "in connection with" requirement, "[i]t is enough that the scheme to defraud and the sale of securities coincide." *SEC v. Zandford*, 535 U.S. 813, 822, 122 S. Ct. 1899, 1904 (2002). The "in connection with" requirement is satisfied whenever "assertions are made . . . in a manner reasonably calculated to influence the investing public, e.g., by means of the financial media . . . ." *SEC v. Texas Gulf Sulfur Co.*, 401 F.2d 833, 862 (2d Cir. 1968). Applying this standard, courts

have concluded that publicly-disseminated press releases, research reports, and website representations that contain materially false and misleading statements regarding an issuer of securities satisfies the "in connection with" requirement. *See, e.g., SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993); *see also Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294 (3d Cir. 2005) (statements made in a research report satisfied the "in connection with" requirement under Section 10(b)); *SEC v. DCI Telecomm., Inc.*, 122 F. Supp. 2d 495, 499-500 (S.D.N.Y. 2000) (statements in press releases and website content satisfy the "in connection with" requirement).

The November 20, 2007 and January 29, 2008 press releases and the Executive Overview were posted on StratoComm's website. The Executive Overview also was posted on the Crystal Research Associates website. During the same time that StratoComm disseminated the press releases and Executive Overview, it sold approximately 62 million shares of stock. In addition, during this time StratoComm's shares were quoted on the over-the-counter market and were purchased and sold by investors. Thus, a reasonable fact finder could only conclude that StratoComm made the false and misleading statements in a manner reasonably calculated to influence investors, and the statements coincided with the offer and sale of the company's stock. Accordingly, the statements were made "in connection with" the offer, purchase or sale of securities.

### 4. False and Misleading Statements Made With Scienter

Scienter under Section 10(b) "refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 1381 (1976). Scienter may be established by knowing misconduct or reckless

disregard for the truth. *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998).  Recklessness

is "an extreme departure from the standards of ordinary care . . . to the extent that the

danger was either known to the defendant or so obvious that the defendant must have

been aware of it." *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978).

Furthermore, "[r]epresenting information as true while knowing it is not, recklessly

misstating information, or asserting an opinion on grounds so flimsy as to belie any

genuine belief in its truth, are all circumstances sufficient to support a conclusion of

scienter." *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007).  The

scienter of a company's officer may be attributed to the company where he was acting

within the scope of his apparent authority. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083,

1106-07 (10th Cir. 2003); *Universal Express, Inc.*, 475 F. Supp. 2d 412, 424 n.4 (S.D.N.Y.

2007).

The incontrovertible record shows that StratoComm and Shearer made materially

false and misleading statements with scienter.  For example, as a development stage

company, StratoComm (through its Chief Executive Officer Shearer, who prepared and/or

wrote the statements at issue), stated in its November 7, 2007 and January 29, 2008

press releases that it was a "provider" of "telecommunication infrastructure technologies."

In its Executive Overview, StratoComm also stated that its TTS units [part of its alleged

telecommunication infrastructure technologies] are "presently available"; expansively

described, in the present tense, the dimension and performance of TTS; and stated that

much of the company's resources were devoted to supporting its "installed TTSs."  These

statements made by StratoComm (through Shearer) are indisputably false and misleading

in that StratoComm and Shearer have conceded through their admissions to the

Commission's Statement of Material Facts that StratoComm had not provided

telecommunication infrastructure technologies to anyone and TTS was neither "presently

available" nor "installed" anywhere at the time these press releases and the Executive

Overview were issued. *See* PSOF ¶¶ 25-30, 49, 63, 84-87; StratoComm's Response to

PSOF at 3-7 (admitting PSOF ¶¶ 25-30, 45, 49, 59, 63, 75-77, 84-87); Shearer Response

to PSOF at 4-7, 9 (same). These undisputed statements, together with the November 20,

2007 and January 29, 2008 press releases announcing two "sales" worth $60 million

(which were, at best, signing of some contracts where no money ever exchanged hands),

leave an indelibly false and misleading impression that the company had a developed,

tested, and presently available product when, in fact, it did not.  *See SEC v. Gabelli*, 653

F.3d 49, 57 (2d Cir. 2011) (explaining that "'half-truths' – literally true statements that

create a materially misleading impression – will support claims for securities fraud")

(emphasis supplied), *rev'd on other grounds sub nom., Gabelli v. SEC*, 133 S. Ct. 1216

(2013).

Furthermore, in its Executive Overview, StratoComm stated that its TTS

units [part of its alleged telecommunication infrastructure technologies] are "presently

available"; expansively described, in the present tense, the dimension and performance of

TTS; and stated that much of the company's resources were devoted to supporting its

"installed TTSs."  These statements made by StratoComm (through Shearer) are

indisputably false and misleading.

A reasonable fact finder could only conclude that in preparing and disseminating

the press releases and Executive Overview which contained the referenced false and

misleading statements regarding the existence of the TTS, Shearer engaged in knowing misconduct. As the founder, CEO and sole director of StratoComm, Shearer was aware that StratoComm had no operational TTS units. Specifically, at all times relevant to this action, Shearer knew that StratoComm: (1) had never built a TTS; (2) had never had the parts to build a TTS; (3) had never had the money needed to acquire the parts to build a TTS; (4) never tested an operational prototype; and (5) had never exchanged a TTS for money. In addition, at the time that he drafted the November 2007 and January 2008 press releases, Shearer knew that StratoComm had not provided "telecommunications infrastructure technologies" to any person or entity. Thus, a reasonable fact finder could only conclude that Shearer engaged in knowing misconduct when he drafted and disseminated the press releases and Executive Overview, portraying StratoComm as a company that had a finished, tested product and multi-million-dollar TTS sales.

Likewise, a reasonable fact finder could only conclude that Shearer engaged in knowing misconduct in that the November 2007 and January 2008 press releases falsely described StratoComm as a "provider" of "telecommunications infrastructure technologies." As StratoComm's CEO and sole director who acted within the scope of his authority, Shearer's scienter is imputed to StratoComm. *Adams*, 340 F.3d at 1106-07.

### 5. Involvement of Interstate Commerce, the Mails, or a National Securities Exchange

Finally, there can be no dispute that the press releases and Executive Overview were used in connection with the interstate sale of securities by telephone, over the

internet,[8] and publicly traded and quoted on the electronic quotation system formerly known as the Pink Sheets.

Thus, the Commission has established all five elements of its claims brought under of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

### C. Liability Under Section 10(b) and Rule 10b-5 as a Controlling Person

Exchange Act Section 20(a) provides that:

[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.

The SEC makes a *prima facie* case of liability under Section 20(a) by proving: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation."  *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (interior quotation marks and citation omitted).  Control may be established by showing that the defendant possessed the "power to direct or cause the direction of the management and policies" of the controlled entity, "whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2 (defining control); *see also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 306 (S.D.N.Y. 2008).

---

[8]While employed by StratoComm, Danzig used his e-mail addresses cdanzig@stratocomm.net and fastbaseball@yahoo.com to conduct StratoComm business.

Once the Commission establishes a *prima facie* case of Section 20(a) liability, the burden shifts to the defendant to prove that he acted in good faith or "did not directly or indirectly induce the act or acts constituting the violation" *First Jersey Secs., Inc.*, 101 F.3d at 1473 (quoting 15 U.S.C. § 78t).

The Commission has established a *prima facie* case against Shearer under Exchange Act Section 20(a) because it is undisputed that he controlled StratoComm. He founded the company and was the Chief Executive Officer and sole member of the Board of Directors. Shearer also was StratoComm's largest beneficial shareholder. StratoComm's primary violations of the securities laws are demonstrated above. Furthermore, Shearer was a culpable participant in the company's issuance of the misleading press releases because he wrote them and he knew that StratoComm had never constructed a TTS and did not have the means to do so. Shearer was a culpable participant in the company's misstatements in the Executive Overview because he arranged for it to be produced, reviewed it, and approved it. Shearer has not rebutted the Commission's *prima facie* case and, and thus is liable under Section 20(a) as a "controlling person" of StratoComm.

### D. Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5

Exchange Act Section 20(e) permits the SEC to bring a civil enforcement action for aiding and abetting securities fraud against "any person that knowingly provides substantial assistance" to a primary violator of the securities laws. 15 U.S.C. § 78t(e); *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012). Aiding and abetting liability under the federal securities laws has three elements: (1) the existence of a securities law violation by

the primary violator; (2) knowledge of the violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in achieving the primary violation. *Apuzzo*, 689 F.3d 204 at 211.

In light of the uncontested facts in this matter, a reasonable fact finder could only conclude that Shearer aided and abetted StratoComm's violations of Section 10(b). He knew that the press releases and the Executive Overview were materially misleading. Specifically, he knew that StratoComm: (1) had never built a TTS; (2) had never had the parts to build a TTS; (3) had never had the money needed to acquire the parts to build a TTS; (4) had never tested an operational prototype; and (5) had never exchanged a TTS for money. In addition, when he drafted the November 2007 and January 2008 press releases, Shearer knew that StratoComm had not provided "telecommunications infrastructure technologies" to any person or entity. Shearer substantially assisted StratoComm's violations because he wrote the press releases and authorized their public distribution. In addition, Shearer arranged for the production of the Executive Overview, reviewed it, approved it, and authorized its dissemination.

A reasonable fact finder could also only conclude that Danzig aided and abetted StratoComm's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with the Executive Overview. He knew that the Executive Overview contained materially misleading statements. Specifically, Danzig knew that, contrary to the representations in the Executive Overview, StratoComm did not have a TTS. Danzig substantially assisted the company's conduct because he referred potential investors to the Executive Overview posted on the internet and "used it as a selling tool." In this regard, Danzig referred investors to the Executive Overview on numerous occasions and

30

instructed a stock broker to use the Executive Overview in dealing with potential investors. Danzig also directed potential providers of public relations and investment banking services to the Executive Overview. Accordingly, Shearer and Danzig aided and abetted StratoComm's violations of Section 10(b) and Rule 10b-5.

### E. Exchange Act Section 15(a) and Securities Act Section 17(a)

#### 1. Acting as an Unregistered Broker

Section 15(a) of the Exchange Act makes it unlawful for a broker to effect any transaction in, or to induce or attempt to induce the purchase or sale of any security, unless such broker: (1) is registered with the Commission; (2) in the case of a natural person, is an associated person of a registered broker; or (3) satisfies the conditions for an exemption or safe harbor. Section 3(a)(4) the Exchange Act defines "broker" as any person "engaged in the business of effecting transactions in securities for the account of others." The SEC is not required to prove scienter to establish a violation of Section 15(a). *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003).

To demonstrate that someone is acting as a broker, the SEC is required to show a regularity of participation in securities transactions "at key points in the chain of distribution." Mass. Fin. Servs, Inc. v. Sec. Investor Prot. Corp., 411 F. Supp. 411, 415 (D. Mass. 1976) *aff'd,* 545 F.2d 754 (1st Cir. 1976). Among the activities that indicate that a person may be acting as a "broker" are: (1) solicitation of investors to purchase securities; (2) involvement in negotiations between the issuer and the investor; and (3) receipt of transaction based compensation. *SEC v. Gagnon*, No. 10-cv-11891, 2012 WL 994892, at *11 (E.D. Mich. March 22, 2012); *SEC v. Hansen*, No. 83 Civ. 3692, 1984 WL 2413, at *10

31

(S.D.N.Y. Apr. 6, 1984).

Danzig acted as an unregistered broker in violation of Section 15(a) of the Exchange Act by regularly engaging in the business of effecting transactions in securities for the accounts of others in exchange for transaction-based compensation. As Director of Investor and Institutional Relations and Executive Director of Institutional Relations, Danzig's primary responsibility was to solicit investors to purchase StratoComm's securities. He contacted investors about buying StratoComm securities, relayed terms of the transactions and handled related paperwork. Danzig also received transaction-based compensation in the form of a discretionary bonus that depended on how much money he raised for StratoComm by selling its securities to investors. Accordingly, the undisputed facts in this case establish that Danzig acted as an unregistered broker.

## 2. Section 17(a) of the Securities Act

Pursuant to Section 17(a) of the Securities Act, it is unlawful in the offer or sale of any securities to use any means of interstate commerce or the mails to: (1) employ any device, scheme, or artifice to defraud, or (2) obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a). Scienter is not an element of a violation of Section 17(a)(2) or (3). *Aaron v. SEC*, 446 U.S. 680, 701–02, 100 S. Ct. 1945, 1958 (1980).

Based on the undisputed evidence, Danzig violated Section 17(a)(1) of the

Securities Act by employing a fraudulent device (the Executive Overview) as "a selling tool" to market StratoComm's stock to investors and to convince investors of the "legitimacy" of the company. He either gave them a copy of the Executive Overview or referred them to Crystal Research Associates' website, where it was posted. Danzig made such referrals on numerous occasions. It is undisputed that Danzig knew the statements contained in the Executive Overview were false because he knew that the company did not have a TTS. PSOF ¶¶ 113, 114. He violated Section 17(a)(2) by obtaining money or property by means of the untrue statements in the Executive Overview. His discretionary bonus was tied to the stock he sold, and he used the Executive Overview, which he knew contained untrue statements, as a "tool" to achieve those sales. Furthermore, he used the Executive Overview to solicit sales that generated funds for his employer, StratoComm. *See Stoker*, 865 F. Supp. 2d at 463 (concluding that Section 17(a)(2) is violated where the defendant obtained money or property for his employer while acting as its agent, or, alternatively, where the defendant personally obtained money indirectly from the fraud). Danzig violated Section 17(a)(3) by engaging in securities transactions and courses of business that operated as a fraud on StratoComm investors.

### F. Offering and Selling Securities in Unregistered Transactions

Sections 5(a) and 5(c) of the Securities Act make it unlawful for any person to offer or sell any security through interstate commerce when no registration statement has been filed. 15 U.S.C. § 77e(a) and (c); *SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005). The purpose of the registration requirement "is to protect investors by promoting full disclosure of

information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).

Section 5 "imposes strict liability on offerors and sellers of unregistered securities" regardless of any degree of fault, negligence or intent on the seller's part. *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) (citation omitted); *accord Aaron v. SEC*, 446 U.S. 680, 714 n. 5, 100 S. Ct. 1945, 64 L. Ed.2d 611 (1980)(a plaintiff need not also show scienter to prove a Section 5 violation). A defendant violates Section 5 if it is shown that he was a necessary participant or a substantial factor in the offering or selling of the unregistered securities. *SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006); *Calvo*, 378 F.3d at 1215; *see also SEC v. Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir.1941)( Liability for violations of Section 5 extends to those who have "engaged in steps necessary to the distribution of [unregistered] security issues.").

To prove a violation of Section 5, the Commission must establishing three *prima facie* elements demonstrating that: (1) the defendant directly or indirectly sold or offered to sell securities; (2) through the use of interstate transportation or communication and the mails; and (3) when no registration statement was in effect. *Cavanagh*, 445 F.3d at 111 n. 13; *Cobalt Multifamily Investors I, LLC v. Arden*, 857 F. Supp. 2d 349, 357-58 (S.D.N.Y. 2011). A defendant may rebut this *prima facie* case by showing that the securities involved were not required to be registered. *Ralston Purina Co.*, 346 U.S. at 126.

It is undisputed that: (1) StratoComm offered and sold more than 62 million shares of stock to investors between late 2007 and April 2010; (2) StratoComm has never registered a securities offering with the Commission; (3) as StratoComm's CEO and sole

34

director, Shearer authorized StratoComm's stock sales and directed the transfer agent to issue stock certificates; and (4) Danzig marketed StratoComm's stock throughout the country by telephone, through e-mail, and in face-to-face meetings. In addition, Danzig served as the designated contact within StratoComm for investors, relayed the terms of stock sales, handled paperwork relating to stock sales, and facilitated the issuance of shares. Thus, StratoComm offered and sold stock in unregistered transactions and Shearer and Danzig were necessary participants in those offerings. Accordingly, the Commission has established the *prima facie* elements of Section 5 liability with respect to StratoComm, Shearer and Danzig.

Defendants assert that they did not comply with the federal securities registration requirements because StratoComm was engaged in an exempted "private offering" only, and as a result, the SEC's unregistered claims (under Section 5 of the Securities Act) against them fail. *See* StratoComm Memo at 15-17; Shearer Memo at 21-24.

Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public. *Cavanagh*, 445 F.3d at 115. The test for whether an offering is an exempt "private offering" under Section 4(2) is whether the offerees could "fend" for themselves, and whether the offerees had access to the same information that registration would provide. *Ralston Purina Co.*, 346 U.S. at 125-27. A number of factors are considered, including, the number of offerees, the relationship of the offerees to each other and the issuer, the manner of the offering (that is, solicitation), information disclosure or access, and the sophistication of the offerees. *SEC v. Life Partners, Inc.*, 912 F. Supp. 4, 10 (D.D.C. 1996). The party claiming the exemption must

show that it is met not only with respect to each purchaser, but also with respect to each offeree. *Life Partner*, 912 F. Supp. at 10.

Given the record in this case, defendants fail to establish entitlement to this exemption. First, there is no merit to defendants' argument that the exemption applies simply because StratoComm's securities were offered only to its existing shareholders. *See SEC v. Sunbeam Gold Mines Co.*, 95 F.2d 699, 702 (9th Cir. 1938) ("We therefore hold that an offering of securities under the Securities Act of 1933 may be a public offering though confined to stockholders of an offering company, a fortiori where the offerees include the stockholders of another company, though seeking to become stockholders of the offeror."). Second, defendants have failed to produce evidence of the required exact number and identity of all offerees. *Life Partners, Inc.*, 912 F. Supp. at 10 (citing *Western Fed. Corp. v. Erickson*, 739 F.2d 1439, 1442 (9th Cir. 1984)) ("To claim the private offering exemption, evidence of the exact number and identity of all offerees must be produced"). Third, defendants admitted to all of the Commission's Statement of Material Facts relating to StratoComm's unregistered stock sales, including the SMFs showing that StratoComm offered and sold stock to investors who were not accredited, that many of StratoComm's shareholders were inexperienced with investing, and that StratoComm never prepared audited financial statements or provided an offering memorandum to investors. *See* PSOF ¶¶ 5-6, 118-122; StratoComm's Response to PSOF at 2, 9 (admitting PSOF ¶¶ 5-6, 118-122); Shearer Response to PSOF at 2, 11 (same). Consequently, the Court finds there exists no material issue of fact whether defendants have rebutted the Commission's *prima facie* demonstration Sections 5(a) and 5(c) violations.

## IV.    CONCLUSION

For the reasons set forth above, the SEC's motion for partial summary judgment imposing liability on defendants on each claim in which the defendants are named [dkt. # 25] is **GRANTED.**

The parties may now present evidence to the Court, by way of separate motion and/or proceeding, regarding appropriate relief to be awarded.

**IT IS SO ORDERED.**

Dated:February 19, 2014

Thomas J. McAvoy
Senior, U.S. District Judge