**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SECURITIES AND EXCHANGE**
**COMMISSION,**

                    **Plaintiff,**

          **v.**                                    **1:11-CV-1188**

**STRATOCOMM CORPORATION,**
**ROGER D. SHEARER, and**
**CRAIG DANZIG,**

                    **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                         **DECISION & ORDER**

**I.     INTRODUCTION**

          This is a civil enforcement action brought by the Securities and Exchange

Commission ("the SEC" or "the Commission") against StratoComm Corporation

("StratoComm"), Roger D. Shearer ("Shearer"), and Craig Danzig ("Danzig"). The Court

previously granted the SEC's motion for partial summary judgment as to liability against

each Defendant on all claims. *See* 02/19/14 Dec. & Ord. ("Order"). The SEC now moves

for judgment imposing various forms of relief as requested in the Complaint. Dkt. # 62.

StratoComm and Shearer have opposed the relief, dkt. # 65, dkt. # 67,[1] and the SEC has

---

[1]Danzig, who is proceeding *pro se*, failed to file any response. The SEC has provided proof of
service of its motion on him. The Court will deem the motion unopposed as to Danzig, but will still examine
(continued...)

replied. Dkt. # 70.  The Court has considered all of the submission and decides the pending motion without the need for oral argument or a hearing.

## II.    BACKGROUND

The SEC alleged in its Complaint that StratoComm, a development stage company whose penny stock traded on the Pink Sheets; its founder and Chief Executive Officer, Shearer; and its Executive Director of Institutional Relations, Danzig, committed securities fraud and registration violations in the offer and sale of StratoComm stock.  As to relief for each Defendant, the SEC requested permanent injunctions from future violations of the federal securities laws; disgorgement of ill-gotten gains with prejudgment interest; and civil penalties. In addition, the Commission sought permanent penny stock bars against Shearer and Danzig, and a permanent officer and director bar against Shearer.

After discovery, the SEC moved for partial summary judgment as to liability against each Defendant on all claims, including the fraud claims. The Commission argued that the undisputed facts showed that from November 2007 through April 2010, StratoComm, acting at Shearer's direction and with Danzig's assistance, knowingly issued and distributed several fraudulent public statements (three press releases and a marketing document called "Executive Informational Overview" or "Executive Overview") designed to portray StratoComm as a successful company that had developed, manufactured and sold sophisticated telecommunications equipment called the Transitional Telecommunications

---

[1](...continued)
whether the motion is facially meritorious.

2

System ("TTS")[2] to countries in the developing world for tens of millions of dollars, and that it was developing a Stratospheric Telecommunications System ("STS"), including solar-powered equipment to be stationed in the stratosphere 65,000 feet above ground.[3]  It is also undisputed, however, that StratoComm has never actually built a TTS; had never tested an operational prototype of a TTS; had never had all of the parts to construct a TTS; had never possessed an aerostat; had never had the funds to acquire an aerostat; has never exchanged a TTS for money; had never received a deposit on a TTS; had no paying customers; and had no revenues.  Instead, its existence depended upon its ability to sell its securities to investors.  The Commission further contended that the undisputed record showed that the Defendants sold approximately 62 million shares of StratoComm's stock to over 100 investors through illegal, unregistered stock offerings and that Danzig, who led the charge in selling StratoComm's stock, was not even registered as a broker.

The Court granted the SEC's motion, imposing liability on the Defendants on each claim in which the Defendants are named. *See* Order.  The Court held that StratoComm, Shearer, and Danzig violated and/or aided and abetted in violating various antifraud provisions of the federal securities laws, including Section 17(a) of the Securities Act and/or Section 10(b) of the Exchange Act. *See id.* at 14-33.  In addition, the Court found that all

---

[2]According to the SEC, StratoComm described its TTS as consisting primarily of an antenna system suspended from a blimp ("aerostat") tethered to the ground. PSOF ¶ 20.  Defendants StratoComm and Shearer denied this statement and contended that "the transitional telecommunications system consists primarily of three components, including the users segment, the flight segment and the ground segment, each of which are composed of separate and distinct components. . . . The flight segment consists of the aerostat, tether, and mooring system." Shearer SOF ¶ 20.  It is undisputed that StratoComm stated that its TTS could provide 500,000 subscribers with broadband internet, wireless voice, or broadcast services.

[3]StratoComm explained that the STS would be able to provide telecommunications services to three million customers in a 1,000 kilometer area, and that it was operating on two parallel tracks: (i) current production and sales of the TTS, and (ii) development of the stratospheric system.

Defendants violated Sections 5(a) and (c) of the Securities Act (for engaging in illegal,

unregistered offerings); and Danzig violated Section 15(a) of the Exchange Act (for acting

as an unregistered broker). *See id.* at 31-36. Finally, the Court found that Shearer was

liable under Section 10(b) as a "controlling person" of StratoComm under Section 20(a) of

the Exchange Act. *Id.* at 29. More specifically, the Court found that StratoComm's four

public statements at issue (from November 2007 to May 2009) were materially false and

misleading. The Court further found that each Defendant acted knowingly in violating and/or

aiding and abetting violations of the anti-fraud provisions of the federal securities laws.

Order at 25 ("The incontrovertible record shows that StratoComm and Shearer made

materially false and misleading statements with scienter"); 26-27 ("A reasonable fact finder

could only conclude that in preparing and disseminating the press releases and Executive

Overview which contained the referenced false and misleading statements ... , Shearer

engaged in knowing misconduct"); 30 (finding that Shearer and Danzig aided and abetted

StratoComm's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

with scienter; "Shearer knew that the press releases and the Executive Overview were

materially misleading"; "[Danzig] knew that the Executive Overview contained materially

misleading statements"), 32-33 ("based upon the undisputed evidence, Danzig violated

Section 17(a)(1) of the Securities Act by employing a fraudulent device (the Executive

Overview) as a 'selling tool' to market StratoComm's stock to investors and to convince

investors of the 'legitimacy' of the company"; "he used the Executive Overview, which he

knew contained untrue statements, as a 'tool' to achieve those sales").

4

## III.    DISCUSSION

The SEC moves for a judgment imposing the relief it seeks in the Complaint. As indicated, StratoComm and Shearer oppose the motion. The Defendants' opposition, boiled to its core, is that all of the relief requested by the SEC is equitable in nature; thus, none is mandated by law but left to the sound discretion of the Court.   Defendants argue that any exercise of discretion should weigh all of the relevant facts and circumstances and, when doing so, should yield lenient sanctions.  Defendants make two principle arguments.  First, they assert that any violation of the securities law was unintentional; was derived from Shearer's fervent belief that he could and would provide an operational telecommunications product making StratoComm successful and yielding a return for its investors; and their actions did not result in any investors being "duped."   Second, the result of this litigation has caused StratoComm and Shearer grave financial distress, thereby making any large financial payment an impossibility.  The Court will address the sought-after relief, and the parties' positions, *seriatim*.

### a.  Injunctions as to All Defendants

The SEC seeks permanent injunctions against all three defendants preventing them from violating the securities laws in the future.  Injunctive relief is expressly authorized by Congress to proscribe future violations of the federal securities laws. *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998).  An injunction should issue if the SEC can show that there is a substantial likelihood that the defendant will violate the securities laws in the future. *See id.* To determine such likelihood, courts consider the totality of the circumstances, including the fact that the defendant has been found liable for illegal conduct; the degree of scienter

5

involved; whether the infraction is an isolated occurrence; whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated. *See id; SEC v. Bass*, 2011 WL 4344001, at *3 (N.D.N.Y. Sept. 14, 2011).

### 1. Whether defendant has been found liable for illegal conduct.

Defendants were found liable on each claim in which the they are named, including fraud/aiding and abetting fraud claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and/or Section 17(a)(1) of the Securities Act. StratoComm and Shearer's attempts to re-litigate their previously rejected protestations of innocence are without merit. Shearer argues that StratoComm did possess a proprietary telecommunications payload in May 2008, and, therefore, the Court improperly rejected this contention in finding that StratoComm's public statements were false. *See* Order, p. 16;[4] Shearer Decl. ¶¶ 18-19. [5]

---

[4]The Court wrote:

> On January 29, 2008, StratoComm issued another press release announcing the "sale" of a TTS unit in Madagascar for $15 million. This release, entitled "StratoComm Corporation Signs $15 Million System Sale Agreement," again described StratoComm as a "provider" of "telecommunications infrastructure technologies." The press release referred to the Madagascar "sale" as "StratoComm's most recent system sale." While Shearer contends that it was a logistical impracticality and financial impossibility to maintain a TTS unit "in stock" before a purchaser was acquired and paid a significant down payment for it, that does not change the misleading nature of the January 29, 2008 press release that indicated that a $15 million sale had occurred in Madagascar. Further, his current assertion that StratoComm "at all times possessed its proprietary telecommunications payload" or "it manufactured the proprietary telecommunications payload" is contradicted by his own prior sworn testimony to the SEC in May 2008. In this regard, Shearer testified that "[t]he payload is completely designed, yeah. <u>We have not manufactured the first one yet</u>." 5/22/2008 Shearer Investigative Test. at 90:5-6 (emphasis added). It is well settled that a party may not create a question of fact sufficient to defeat summary judgment by submitting an affidavit that contradicts prior sworn testimony. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997).

Order, p. 16.

[5] Shearer asserts that when he testified "The payload is complete designed, yeah. We have not manufactured the first one yet," the statement was in reference to "a particular proposed system sale-and

(continued...)

However, and assuming, *arguendo*, that StratoComm possessed a proprietary

telecommunications payload in May 2008, that does not negate the falsity of the many

statements contained in StratoComm's November 20, 2007 Press Release;[6] its January 29,

2008 Press Release;[7] its September 2, 2008 "Executive Informational Overview;"[8] and its

---

[5](...continued)
while the particular payload for that particular sale had not yet been produced,StratoComm did then physically possess its proprietary payload . . . at its facility in Eatontown, New Jersey." Shearer Decl. ¶ ¶ 18-19.

[6]On November 20, 2007, StratoComm issued a press release entitled "StratoComm Announces $45 Million System Sale." This states that Evergreen ISP Platform, PLC "has contracted with StratoComm for the purchase of $45,000,000 of StratoComm Transitional System telecommunications equipment and services." The press release described StratoComm as a "provider" of "telecommunications infrastructure technologies" and stated that a "$45 million contract" was "awarded" to StratoComm by an entity in Cameroon for three TTS units and related services. However, it is undisputed that on November, 20, 2007, StratoComm had not provided telecommunications infrastructure technologies to any person or entity, and Shearer knew StratoComm did not have the funding in place to build a TTS. Thus, defendants conceded that when Shearer drafted the November 20, 2007 press release, he knew that StratoComm had not provided telecommunications infrastructure technologies to any person or entity. Moreover, StratoComm never received a monetary deposit or payment from Evergreen ISP Platform based upon the sale announced in the November 20, 2007 press release, and StratoComm never received any revenue based upon the sale referenced in the November 20, 2007 press release.

[7]The January 29, 2008 press release announced the "sale," valued at $15 million, of "StratoComm's most recent system" and related services to StratoComm's joint venture partner in Madagascar, StratoComm Madagascar SA . The press release described StratoComm as a "provider" of telecommunications infrastructure technologies. Even assuming that StratoComm "at all times possessed its proprietary telecommunications payload" or that "it manufactured [a] proprietary telecommunications payload," there is no dispute that as of January 29, 2008, StratoComm had not provided telecommunications infrastructure technologies to any person or entity; StratoComm never received a monetary deposit or payment from StratoComm Madagascar SA based upon the sale announced in the January 29, 2008 press release; and StratoComm never received any revenue based upon the agreement referenced in the January 29, 2008 press release.

[8]The Executive Informational Overview stated that "StratoComm's aerostat is nearly 37 meters in length and 12 meters at its widest portion. It meets all U.S. Federal Aviation Administration (FAA) requirements, including the presence of an emergency flight termination system and proper lighting, and can carry a payload of up to 225 kilograms." The Executive Informational Overview further stated:

The TTS is a tethered aerostat 37 meters in length positioned 1,500 meters above the region for which it provides telecommunications. Due to its proprietary payload designed in-house by StratoComm's Development Team, the TTS can support broadband Internet, wireless voice, or broadcast services (up to 100 video channels) for roughly 500,000 customers in an 80-kilometer diameter area.

The Executive Informational Overview described the TTS as "presently available," and stated that much of the company's resources were devoted to support of its "installed TTSs." Moreover, the  Executive

(continued...)

May 5, 2009 Press Release.[9]  Because these false statements were likely to influence

investor decisions, that were violative of the securities law even if some investors were not

duped by them.  This is because  the SEC is not required to prove that a victim relied upon

the defendants' omission or misrepresentation in making an investment decision in an

enforcement action. *See SEC v. Apuzzo*, 689 F.3d 204, 213 (2d Cir. 2012).  Thus, even

assuming that there exists no evidence that any of the investors were actually duped into

investing, that fact is of no moment on the issue of liability.[10]  It should also be noted that

Danzig was found to have acted as an unregistered broker in violation of Section 15(a) of

the Exchange Act; and all Defendants were found to have violated Sections 5(a) and 5(c) of

the Securities Act by offering and selling securities in unregistered transactions.

In addition, the SEC has demonstrated that Shearer and Danzig are recidivist

---

[8](...continued)
Informational stated that, "[a]t present, the Company has sold three TTS aerostats to Cameroon [and] one to Madagascar…" The Executive Informational Overview also stated that StratoComm was "presently selling" the TTS, that TTS units "have been sold…for $60 million to date," and that its goal was to obtain "up to an additional $75 million in sales" by the end of 2008, which was less than four months after the Executive Informational Overview was issued.

It is undisputed that when Shearer approved the Executive Informational Overview for public distribution, he knew that (1) StratoComm had never owned an aerostat; (2) StratoComm never had the funding to purchase an aerostat or build an operational TTS; (3) StratoComm has never delivered an operational TTS to any entity; (4) StratoComm had not installed a TTS; and (5) StratoComm had not received payment in connection with the sales agreements referenced in the November 20, 2007 and January 29, 2008 press releases.  Danzig reviewed the Executive Informational Overview before it was finalized.

[9]The May 5, 2009 press release was entitled "StratoComm Corporation Schedules Initial System Turn On."  This  stated that "a team of engineers" was departing for Cameroon, "the location for installation of StratoComm's first commercial wireless telecommunications system." It described testing of the system at the company's facilities in New Jersey and the scheduled departure of the "installation and training team."  It also emphasized that testing would ensure "efficient installation and reliable operation with system turn on." While it was conceded by the SEC that the reference in the press release to "StratoComm's first commercial wireless telecommunications system" was not to a TTS, the press release did not disclose that the system installed in Cameroon was not a TTS.  Further, the press release did not disclose that the system installed in Cameroon was anchored to a tower.

[10]Thus, even though Defendants have presented affidavits from 29 investors who claim they were not duped into investing, this does not negate liability.

violators of the securities laws.  In this regard, it is undisputed that in 2001, Shearer was

ordered by the SEC to cease and desist from future violations of Section 5(a) and 5(c) of

the Securities Act for selling unregistered securities.  *See* SEC Order Instituting

Proceedings, Making Findings, and Imposing a Cease-and-Desist Order, Oct. 3, 2001 (SEC

Ex. 1).  The SEC has also demonstrated that Danzig was sanctioned by the State of

Delaware in connection with unauthorized transactions in a customer account and was

barred from obtaining a license to sell securities in New Jersey. *See* FINRA BrokerCheck

Report for Craig Danzig at 6-8 (discussing the Delaware and New Jersey regulatory

proceedings against Danzig) (SEC Exhibit 3).  All considered, this factor weighs in favor of

injunctive relief.

### 2.  The degree of scienter involved.

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n. 12 (1976).  The Court found that each

Defendant knowingly violated, and/or aided and abetted violations of, the anti-fraud

provisions of the federal securities laws. Order at 26-27 ("A reasonable fact finder could

only conclude that in preparing and disseminating the press releases and Executive

[Informational] Overview which contained the referenced false and misleading statements

…, Shearer engaged in knowing misconduct"); 27 ("As StratoComm's CEO and sole

director who acted within the scope of authority, Shearer's scienter is imputed to

StratoComm"); 30 (finding that Shearer aided and abetted StratoComm's violations of

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder with scienter; "Shearer knew

that the press releases and the Executive Overview were materially misleading").  Further,

9

and contrary to Shearer's suggestion, there is no requirement that a defendant must act "intentionally" to be permanently enjoined. *See, e.g., Bass*, 2011 WL 4344001, at *4 (defendants' acting with the requisite level of scienter -- that is, knowingly in that case -- under the Securities and Exchange Acts was sufficient for permanent injunctions). This factor weighs in favor of injunctive relief.

### 3. Whether the infraction is an isolated occurrence.

The Court found that StratoComm and Shearer falsely portrayed StratoComm as a development-stage company that had progressed to the operational stage with a finished product and sales, when it had not. Order at 22. StratoComm had no products, no paying customers, and no revenues; its existence depended on its ability to sell securities to investors. Order at 2, 22. The Court also found that the fictitious portrayal was advanced through a series of materially false and misleading public statements (three press releases and Executive Informational Overview) over the course of almost two and half years, whereby StratoComm received approximately $4 million from selling its penny stock to more than 100 investors. Order at 3, 15-27. Contrary to Defendant's arguments, the instant infractions were not isolated occurrences but rather appeared to be a part of a long-standing and somewhat elaborate scheme to defraud investors. Moreover, Danzig was found to have acted as an unregistered broker, and all Defendants were found to have violated the Securities Act by offering and selling securities in unregistered transactions. This factor weighs in favor of injunctive relief.

### 4. Whether the defendant continues to maintain that his past conduct was blameless.

Defendants argue, *inter alia*, (a) that StratoComm and Shearer's false and

misleading public statements were immaterial; (b) that Shearer, StratoComm's CEO and sole member of its Board of Directors, "at all times has operated with the success of the company in mind;" and (c) that Shearer did not have the appropriate scienter to commit any wrongdoing.  The arguments are contradicted by the Court's decision in this matter. Further, the securities laws that were violated here are intended to protect the unknowing, unsophisticated investor.  A party's good faith intentions, no matter how valid, do not allow a party to run afoul of the law without repercussions.  Moreover,  Defendants' protestation of innocence is a factor that weighs in favor of the sought-after injunctive relief.  *See SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996) ("[T]he court may properly view a culpable defendant's continued protestations of innocence as an indication that injunctive relief is advisable.").  This factor weighs in favor of injunctive relief.

### 5.  Whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

StratoComm and Shearer do not pledge to forego future opportunities to engage in additional securities fraud violations.  Rather, Shearer argues that StratoComm, which has "no products, no paying customers, and no revenues," must continue to maintain its website (http://www.stratocomm.net) to "secur[e] a moneyed purchaser of the telecommunications systems it has been marketing for many years."  Further, and far from pledging to refrain from rasing funds from investors, StratoComm and Shearer merely claim that they would obtain "competent" legal counsel if they seek investments in the future.  These arguments do not militate against the issuance of an injunction against StratoComm and Shearer.

Moreover, as indicated above, the SEC has demonstrated that Shearer and Danzig are recidivist violators of the securities laws.  The Court finds that this factor weighs in favor

11

of injunctive relief.

### 6. Totality of the circumstances

Based upon the totality of the circumstances, the Court finds that StratoComm, Shearer, and Danzig should be permanently enjoined from violating the federal securities laws on which they were found to be liable. *E.g., SECv. Zwick,*, 2007 WL 831812, at *19 (S.D.N.Y. Mar. 16, 2007) (citing *SEC v. Manor Nursing Ctrs., Inc*., 458 F.2d 1082, 1103 (2d Cir. 1972)).

### b. Disgorgement and Prejudgment Interest as to All Defendants

The SEC seeks disgorgement and prejudgment interest from all three defendants. Courts have broad equity powers to order the disgorgement of "ill-gotten gains" obtained through the violation of the securities laws and, if ordered, in calculating the disgorgement amount. *SEC v. First Jersey Secs., Inc,* 101F.3d1450, 1474-75 (2d Cir. 1996); *SEC v. Bass*, 2012 WL 5334743, at *2 (N.D.N.Y. Oct. 26, 2012) ("*Bass II*"). Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable. *First Jersey*, 101 F.3d at 1474.

In calculating disgorgement, a "reasonable approximation of profits causally connected to the violation" is sufficient and "any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose conduct created that uncertainty." *Id.* at 1475 (brackets in original); *Bass II*, 2012 WL 5334743, at *3 (same). Once the SEC has shown a reasonable approximation, the burden shifts to the defendant to demonstrate that the SEC's proffered disgorgement amount was not a reasonable approximation. *SEC v. First City Fin. Corp., Ltd*, 890 F.2d 1215, 1232  (D.C. Cir. 1989).

Courts have the discretion to find joint and several liability of disgorgement when two or more defendants have collaborated to violate the securities laws, particularly when a defendant is found liable as a "controlling person" of another defendant entity under Section 20(a) of the Exchange Act. *See First Jersey*, 101 F.3d at 1475 (upholding disgorgement on a joint and several basis of a firm and owner/chief executive officer where a firm received gains through its unlawful conduct and where its owner and chief executive officer has collaborated in that conduct and has profited from the violations).

Disgorgement typically includes prejudgment interest, such that wrongdoers do not profit from their illegal conduct. *See First Jersey*, 101 F.3d at 1476; *Bass II*, 2012 WL 5334743, at *3 ("Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity.") (quoting *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996)).   Prejudgment interest is computed according to the underpayment rate used by the Internal Revenue Service pursuant to 26 U.S.C. § 6621(a)(2). *See First Jersey*, 101 F.3d at 1476.

In support of disgorgement and prejudgment interest, the SEC has offered the declaration of Brad Mroski, an Assistant Chief Account in the Division of Enforcement of the United States Securities and Exchange Commission, and a Certified Public Accountant licensed in the states of Colorado and Texas.  He has been employed by the SEC for more than three years, and prior to that engaged in forensic accounting and auditing for an international accounting and consulting firm for almost 10 years.  Based upon his review of the evidence in this matter (as more fully set forth in his declaration), Mroski concludes that the total amount of investor deposits into StratoComm's bank accounts for the period of

November 21, 2007 through April 30, 2010 was approximately $4,086,245.00. It is this amount that the SEC contends should be disgorged jointly and severally by StratoComm and Shearer. Mroski concludes that prejudgment interest on the $4,086,245.00 amount, calculated using the IRS's underpayment rate, is approximately $882,464.68. *See* Declaration of Brad Mroski, ¶¶ 3, 5-6, 9-11 (discussing his review and methodology for calculating disgorgement and prejudgment interest).

Mroski also concludes that, based on his review of StratoComm's annual ledgers for 2008, 2009 and 2010 from which he was able to isolate entries representing withdrawals for Shearer's benefit, and deducting the repayment amount from the calculation of total withdrawals, that Shearer was paid $404,746.67 from StratoComm for the period January 2, 2008 through April 24, 2010. *See* Declaration of Brad Mroski, ¶ 7. However, the SEC argues that StratoComm and Shearer should be held to pay the total amount of disgorgement and prejudgment interest on a joint and several basis (not that Shearer should be responsible for disgorgement in the amount of the payments he received from StratoComm[11]) because StratoComm and Shearer (as StratoComm's "controlling person") were essentially acting as alter egos of each other, *see* Order at 22-23, 25-27, 29, and were sharing in the profits together. *See* Mroski Decl. ¶ 7 (discussing withdrawals from StratoComm's account for the benefit of Shearer).

In their oppositions, StratoComm and Shearer do not challenge Mroski's methodology for calculating disgorgement and prejudgment interest, or the application of the joint and several liability principles under the facts of this case. Instead, they argue that

---

[11]As discussed more fully below, the SEC contends that Shearer's civil penalty should be equal to the $404,746.67 that he was paid by StratoComm.

the requested amounts are "excessive" because: (1) a subset of investors submitted affidavits attesting that they were not "duped" by StratoComm and Shearer (and therefore approximately $1.16 million, representing their investments, should not be included in the disgorgement calculation); (2) Shearer did not "loot" the company "for his own financial gain"[12]; and (3) StratoComm and Shearer are experiencing extreme financial hardships. None of these arguments are meritorious.

First, the purpose of disgorgement is not to compensate for losses but to deprive the wrongdoer of ill-gotten gain. *SEC v. Whittemore*, 659 F.3d 1, 11 n. 2 (D.C. Cir. 2011). Moreover, requiring payment of prejudgment interest prevents a defendant from obtaining the benefit of what amounts to an interest-free loan procured as a result of illegal activity. *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). As the SEC correctly asserts, the requested remedies of disgorgement and prejudgment interest have nothing to do with whether a subset of investors were or were not "duped" by the materially false and misleading public statements by StratoComm and Shearer. As indicated above, to establish liability the SEC is not required to prove that a victim relied upon the defendants' omission or misrepresentation in making an investment decision. *See Apuzzo*, 689 F.3d at 213.

Second, whether Shearer, in fact, "looted" StratoComm "for his own financial gain" is of no consequence in determining the amount of disgorgement and prejudgment interest to

---

[12]Shearer contends that the monies he received from StratoComm were an agreed pay down of funds owed to Shearer by PriorityAcesss, a StratoComm shareholder and financial supporter. Declaration of Roger D. Shearer [Shearer Declaration], ¶ 6. Otherwise, Shearer asserts that funds he received from StratoComm were immediately converted into checks payable to satisfy obligations of payroll and vendor invoices of StratoComm. *Id.* ¶ 6.

award.  Rather, this determination is based upon Mroski's undisputed calculations made after examining StratoComm's general ledgers and the relevant bank records which showed that, during the period of November 21, 2007 through April 30, 2010, StratoComm obtained approximately $4,086,245.00 from investors; that Shearer (as StratoComm's CEO and sole director of its Board of Directors) paid himself approximately $404,746.67 from StratoComm's bank account which had received investors' money; and that prejudgment interest on the $4,086,245.00 amount is approximately $882,464.68 for StratoComm and Shearer. *See* Mroski's Declaration ¶¶ 3, 5-11.  The SEC does not seek disgorgement on the money paid to Shearer.

Third, StratoComm's and Shearer's plea of poverty is of no moment in the disgorgement calculation.  A claim of financial hardship is not among the factors considered when evaluating whether disgorgement is appropriate. *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 565 (S.D.N.Y. 2009) (explaining that "[i]n deciding a motion for disgorgement, a court is not bound to consider a defendant's claims of financial hardship" and denying any reduction of disgorgement and prejudgment interest based upon such claims); *SEC v. Thomas James Assoc., Inc.*, 738 F. Supp. 88, 95 (W.D.N.Y. 1990) ("Nor may a securities law violator avoid or diminish his responsibility to return his ill-gotten gains by establishing that he is no longer in possession of such funds due to subsequent, unsuccessful investments or other forms of discretionary spending.").  Moreover, "to withhold the remedy of disgorgement or penalty simply because a swindler claims that [he] has already spent all the loot and cannot pay would not serve the purposes of the securities laws." *Universal Express*, 646 F. Supp. 2d at 565.  Indeed, even if StratoComm and Shearer no longer have

the benefit of more the than $4 million of investors' money, the Court should not "ignore the possibility that a defendant's fortunes will improve, and that one day the SEC will be able to collect on even a severe judgment." *SEC v. Kane*, 2003 WL 1741293, at *4 (S.D.N.Y. Apr. 1, 2003). Accordingly, the Court will award the SEC the amount of disgorgement and prejudgment interest it has requested for StratoComm and Shearer, to be paid jointly and severally.

As to Danzig, the SEC argues that he knowingly committed securities fraud and other violations, including leading the illegal sale of approximately 63 million unregistered shares of StratoComm's stock to more than 100 investors, while not even registered as a broker. *See* Order at 29-37. The SEC asserts that, therefore, Danzig should be responsible for disgorgement of his ill-gotten gains. Using the same methodology as employed for Shearer, Mroski concludes that the payments received by Danzig (or made for Danzig's benefit) from StratoComm for the period of November 20, 2007 through April 30, 2010 was $415,247.41. *Id.* ¶ 8. Using the payments to Danzig as a potential disgorgement amount, and applying the IRS's underpayment rate, Mroski concludes that the pre-judgment interest Danzig owes is $73,810.64. *Id.* ¶ 11. Thus, the SEC argues, the total approximate amount to be disgorged by Danzig should be $489,058.05. *See* Mroski Decl. ¶ ¶ 3, 5, 8-11.

The Court does not find that Danzig should be required to disgorge any money. The money that Danzig received from StratoComm came from the investor contributions to StratoComm. Because StratoComm and Shearer are required to pay disgorgement in the full amount of the investors' contribution, with interest, disgorgement by Danzig of a portion of that money would result in a double payment for the same conduct. It will not be

ordered. Danzig's involvement in the securities law violations will be addressed through other devices.

### c. Penny Stock Bars as to Shearer and Danzig

The Court may enter an order prohibiting a party from permanently participating in a penny-stock offering against "any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny-stock." 15 U.S.C. § 78u(d)(6)(A). In determining whether a penny stock bar is appropriate, the Court considers: "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 429-30 (S.D.N.Y. 2007); *SEC v. Elliott*, No. 09 Civ. 7594, 2011WL3586454, at *14 (S.D.N.Y. Aug. 11, 2011).

Having considered all of these factors, the Court finds that Shearer and Danzig should be barred from participating in an offering of penny stock unless they first obtain approval from the Court.

### d. Officer and Director Bar as to Shearer

This Court also has broad equitable powers to permanently bar Shearer from serving as an officer and director of a public company. *See SEC v. Bankosky*, 716 F.3d 45, 47 (2d Cir. 2013). The standard for imposing such a bar essentially mirrors that for imposing a penny stock bar. *See Universal Express*, 475 F. Supp. 2d at 429.

Having considered all of the relevant factors, the Court determines that Shearer

18

should be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to 12 of the Exchange Act or that is required to file reports pursuant to Section 15 (d) of the Exchange Act unless Shearer first obtains approval from the Court for such conduct.

### e. Civil Penalties as to All Defendants

The SEC also requests maximum "third tier" civil penalties against each of the Defendants.

> Both the [Securities Act of 1933 and the Securities Exchange Act of 1934] authorize three tiers of monetary penalties for statutory violations. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). Under each statute, a first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; a third-tier penalty may be imposed when, in addition to meeting the requirements of the second tier, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," 15 U.S.C. §§ 77t(d)(2)(A)-(C); 15 U.S.C. §§ 78u(d)(3)(B)(i)-(iii)

*SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013).

Each tier provides that, for each violation, the amount of the penalty "shall not exceed the greater of " a specified monetary amount or the defendant's "gross amount of pecuniary gain . . ." *Id.* (citing 15 U.S.C. §§ 77t(d), 78u(d)(3)). The maximum statutory amounts for a natural person and for any other person, respectively, are: (1) $5,000 and $50,000 at the first tier, (2) $50,000 and $250,000 at the second tier, and (3) $100,000 and $500,000 at the third tier. *SEC v. GTF Enterprises, Inc.*, 2015 WL 728159, at *2 (S.D.N.Y. Feb. 19, 2015) (citing 15 U.S.C. §§ 77t(d), 78u(d)(3)).[13]

---

[13]The statutory maximums are adjusted for inflation. 17 C .F.R. Ch. II, Pt. 201, Subpt. E. The SEC notes that the maximum third tier penalty is the greater of (1) $130,000 or $150,000 per violation for a natural person or $650,000 or $725,000 per violation for any other person (*e.g.*, corporate entity), 17 C.F.R. Part 201, Subpart E (§§ 201.1001-1004) (adjusting for inflation); or (2) the "gross amount of pecuniary gain" to the

(continued...)

"Beyond setting maximum penalties, the statutes leave 'the actual amount of the penalty . . . up to the discretion of the district court.'" *Razmilovic*, 738 F.3d at 38 (quoting *SEC v. Kern*, 425 F.3d 143, 153 (2d. Cir. 2005)). To inform that discretion, courts in this Circuit weigh the following so-called *Haligiannis* factors: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Rajaratnam*, 822 F. Supp.2d 432, 433 (S.D.N.Y. 2011)(quoting *SEC v. Haligiannis*, 470 F. Supp.2d 373, 386 (S.D.N.Y.2007)); *see also SEC v. Gupta*, 569 F. App'x 45, 48 (2d Cir. 2014) (citing *Haligiannis*); *GTF Enterprises, Inc.*, 2015 WL 728159, at *2.

With regard to civil penalties, the SEC argues:

As discussed in the Court's Order, each Defendant's misconduct was egregious and repeated, spanning over two and half years. They also violated and/or aided and abetted in the violations of the anti-fraud provisions (Section 10(b) and/or Section 17(a)(1)) with a high degree of scienter (that is, they engaged in knowing misconduct). None of them have admitted the wrongful nature of their conduct, which affected more than 100 investors for losses of more than $4 million. Finally, as shown in the SEC's disgorgement and prejudgment calculations above, each Defendant gained substantial personal benefit from the infusion of the illegally obtained proceeds; StratoComm obtained illegal pecuniary gain of approximately $4,889,809.77; Shearer approximately $483,646.58; and Danzig approximately $489,058.05. *See* Mroski Decl. ¶¶ 5-8, 10-11.

Accordingly, the Commission respectfully requests that each Defendant be required to pay a maximum third tier civil penalty. *See, e.g., SEC v. Provident Royalties, LLC*, Civil Action No. 3:09-CV-01238-L, 2013 WL 5314354, at *9 (N.D. Tex. Sept. 23, 2013) (holding defendants' liable and ordering a third tier civil penalty in an amount equal to the "gross amount of pecuniary gain" resulting from their violations of the

---

[13](...continued)
defendant as a result of the securities law violation. 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).

law); *SEC v. Wilde*, No. SACV 11-0315 DOC (AJW), 2012 WL 6621747, at *16 (C.D. Cal. Dec. 17, 2012) (same).

SEC Mem. L. p. 9.   The SEC seeks a civil penalties against StratoComm in the amount of $4,889,809.77; against Shearer in the amount of $483,646.58; and against Danzig in the amount of  $489,058.05.  These amounts are based upon the gross amount of alleged pecuniary gain of each defendant.

In opposition, StratoComm and Shearer argue that no penalty, or at least a non-third tier penalty, should be imposed against them.  In support, they argue that

> third tier penalties are available only for securities violations involving fraud and a high level of scienter.  Because, however, the SEC cannot demonstrate which, if any, of the sales of stock were causally related to any alleged fraud, a penalty in an amount equal to the entire investment proceeds during the relevant time period is again excessive. Instead, this amount should be reduced, at a minimum, by the investments not causally related to the alleged fraud as well as by the amount sought by the SEC for prejudgment interest. Third tier penalties also are inappropriate for the Section 5 violation because Mr. Shearer did not act recklessly when the unregistered stock was sold.

StratoComm Mem. L. pp. 1-2.

This argument is unavailing.  It is true that the Securities Act and the Securities Exchange Act provide a maximum amount of penalty "for each violation." 15 U.S.C. §§ 77t(d)(2); 78u(d)(3)(B).  While these statutes do not define a "violation," courts have determined the number of violations involved using different methods. *GTF Enterprises, Inc.*,  2015 WL 728159, at *4.   Some courts "look to the number of investors defrauded or the number of fraudulent transactions to determine the number of violations." *Id.* (citations omitted).  Others "consider the number of statutes that each Defendant violated, or whether the violations were all part of a single scheme." *Id.* (citations omitted).  Here, the Court employs the second method.  Although some investors may have invested in StratoComm

knowing that its public statements were false, the securities violations that the Court found were not that each individual investor was duped, but that the defendants engaged in a single scheme to dupe investors in general through the use of fraudulent statements and publications in connection with the public offering of StratoComm stock. The Court need only find one violation of the Securities law per defendant, which it has, as set forth in the Order.

Defendants also argue that third tier penalties are inappropriate because there is no proof as to which, if any, of the "transactions during the relevant time period were causally connected to the alleged misleading press relief and Executive Overview."StratoComm Mem. L. p. 6.  For the reasons just discussed, the Court need not tie any specific "transaction" to a securities law violation in order to impose civil penalties in this case.

In addition, Defendants argue that "[a]lthough this Court determined that Mr. Shearer acted knowingly in connection with the press releases and Executive Overview, . . . the money invested into StratoComm was used for research and development and to facilitate contracts for the sale of the TTS, and to pay employees."  The good-faith use of the ill-gotten gains does not negate the securities law violations.  It does, however, impact the egregiousness of the defendants' conduct under the first of the *Haligiannis* factors.

Defendants correctly argue that a finding of recklessness is necessary to justify second or third tier penalties for violations of Section 5.  *See SEC v. Mattera*, 2013 WL 6485949 at *16 (S.D.N.Y. Dec. 9, 2013).  However, besides a Section 5 violation by Shearer, the Court found that StratoComm, Shearer, and Danzig violated and/or aided and abetted in violating various antifraud provisions of the federal securities laws, including Section 17(a) of the Securities Act and/or Section 10(b) of the Exchange Act. *See* Order at

14-33.  Thus, a finding of recklessness is not required to impose civil penalties under these other sections of the securities law.

Finally, Defendants assert their impaired financial worth as a mitigating factor in the imposition of civil penalties.  The SEC correctly notes that the Southern District has held that, "in light of the goal of deterrence, a defendant's claims of poverty cannot defeat the imposition of a civil penalty by a court." *Kane*, 2003 WL 1741293, at *4.  However, the Southern District also held:  "While the court may take the defendant's current financial difficulties into account, these circumstances alone cannot negate the need for a severe civil penalty." *Id.*

In the instant case, taking into account the substantial financial disgorgement and prejudgment interest that will be imposed against StratoComm and Shearer; the uncontradicted evidence that some investors invested in StratoComm knowing that it did not have the contracts it professed it had or the capability to put into work the technology the company was based upon; the penny stock and officer and director bars imposed; and the professed and reasonably anticipated financial difficulties that will result to defendants from this litigation, the Court imposes Tier 3 civil penalties against StratoComm in the amount of $100,000.00; against Shearer in the amount of $50,000.00; and against Danzig in the amount of  $25,000.00.

## IV.   CONCLUSION

For the reasons set forth above, the SEC's Motion for Remedies [dkt. # 39] is **GRANTED in part and DENIED in part**.   Therefore,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Defendants

StratoComm Corporation, Roger D. Shearer, and Craig Danzig, and Defendants' agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Decision and Order by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a) to employ any device, scheme, or artifice to defraud;

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendants StratoComm, Roger D. Shearer, and Craig Danzig, and Defendants' agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Decision and Order by personal service or otherwise are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;

(b) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendants StratoComm Corporation, Roger D. Shearer, and Craig Danzig and Defendants' agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Decision and Order by personal service or otherwise are permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

(a) Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b) Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c) Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement

25

has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant Craig Danzig and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Decision and Order by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 15(a)(1) of the Securities Exchange Act of 1934 [15 U.S.C. § 78o(a)(1)], by using the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless registered in accordance with subsection (b) of Section 15 of the Exchange Act [15 U.S.C. § 78o(b)].

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], Defendant Roger D. Shearer is permanently prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] unless he first obtains approval and permission from the Court.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

26

Defendants Roger D. Shearer and Craig Danzig are permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock unless they first obtain approval and permission from the Court. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. 240.3a51-1].

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendants StratoComm Corporation and Roger D. Shearer are jointly and severally liable for disgorgement of $4,086,245.00, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $882,464.68 (for a total of $4,968,709.68). StratoComm Corporation is further liable for a civil penalty in the amount of $100,000.00 and Roger D. Shearer is further liable for a civil penalty in the amount of $50,000.00, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. Defendants may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendants may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; StratoComm Corporation or Roger D. Shearer as a defendant in this action; and specifying that payment is made pursuant to this Decision and Order.

Each Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, each Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to any Defendant. The Commission shall send the funds paid pursuant to this Decision and Order to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest through any collection procedures authorized by law.  Each Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant Craig Danzig is liable for a civil penalty in the amount of $25,000.00, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Craig Danzig as a defendant in this action; and specifying that payment is made pursuant to this Decision and Order.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant. The Commission shall send the funds paid pursuant to this Decision and Order to the United States Treasury.

Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Decision and Order and the subsequent Judgment.

The motion is **DENIED** in all other respects.

**It is SO ORDERED.**

Dated:March 9, 2015

Thomas J. McAvoy
Senior, U.S. District Judge